## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

ADENIS ENRIQUE PRIETO REFUNJOL,
KEITA MORY, and SIDI NJIE,

Petitioner-Plaintiffs,

\- vs. -

REBECCA ADDUCCI, in her official capacity as Detroit
District Director of U.S. Immigration & Customs
Enforcement; and U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT,

Respondent-Defendants.

Case No. ___20-cv-2099___


## PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241 AND COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

## INTRODUCTION

1.      Last night, staff at the Morrow County Jail ("Morrow") announced that a U.S. Immigration and Customs Enforcement ("ICE") detainee who had been housed in general population there for more than one week, tested positive for COVID-19 and was moved into isolation. The detainee had had a high fever for days. His bunkmate, also feverish, has now been isolated as well. The two detainees had been transferred to Morrow from the Franklin County Jail ("Franklin"), where ICE temporarily houses people before transferring them to longer term detention facilities.

2.       Less than two weeks prior, there had been positive tests among detainees at Franklin as well as at the Butler County Jail ("Butler") where, like Morrow, ICE houses its detainees long term. During this period, ICE transferred detainees from Franklin to Butler and Morrow, and well as in between Butler and Morrow, without quarantining the transferees.

3.      Petitioner-Plaintiffs ("Plaintiffs") are three ICE detainees housed in the Butler and Morrow jails. They all have serious health conditions. They each have U.S. Citizen families and friends in the Central and Southern Ohio area, and they each are currently civil detainees, having either no, or low level criminal histories.

4.      These Plaintiffs face an acute risk of contracting the virus unless they are released immediately from the facilities in which they are detained, both of which now have confirmed cases of COVID-19.

5.      The novel coronavirus that causes COVID-19 has led to a global pandemic.  As of April 23, 2020, over 2.7 million people worldwide have received confirmed diagnoses of COVID-19, and over 190,000 of those people have died. In Ohio, over 14,000 people have tested positive, 3,816 of which are prisoners in the Ohio state prison system.

6. Both Morrow and Butler jails have now had detainees test positive for COVID-19. If these county jails follow the pattern of Ohio's state prisons, the number of confirmed cases is likely to explode exponentially. There is no vaccine against COVID-19, and there is no known cure. It is highly contagious, and it is particularly dangerous because even pre or asymptomatic people can transmit it to others. No one is immune from contracting the illness. COVID-19 is most likely to cause serious illness and elevated risk of death for older adults and those with certain underlying medical conditions or disease, but it can have these dire results even for the healthiest young people.

7. COVID-19 numbers are on the rise in both Morrow and Butler counties, in the communities outside of the jails. As of April 23, 2020, Butler County has 201 cases with 61 hospitalizations and Morrow County has 25 cases with four hospitalizations. Tragically, the number of cases and hospitalizations in Morrow County is expected to rise due to its proximity to the adjacent Marion County where 2,161 cases have been confirmed. For the same reason, local hospitals will experience a resource strain.

8. COVID-19 can cause severe damage to lung tissue, sometimes leading to a permanent loss of respiratory capacity, and it can damage tissues in other vital organs including the heart and liver. Patients with serious cases of COVID-19 require advanced medical support, including positive pressure ventilation and extracorporeal mechanical oxygenation in intensive care. That treatment can require the use of specialized equipment, like ventilators. The pandemic has put ventilators in high demand and short supply around the world and has led to severe shortages of personal protective equipment ("PPE") such as face masks and gowns. Patients who do not die from serious cases of COVID-19 may face permanent damage to their health and/or

prolonged recovery periods, including extensive rehabilitation from neurologic damage and loss of respiratory capacity.

9.      The only known effective ways to reduce the risk of serious illness or death caused by COVID-19 for vulnerable people are social distancing along with improved hygiene.  As a result, unprecedented public health measures to eliminate concentrations of people are being undertaken in all fifty states and around the world.

10.     People in enclosed group environments—where they live, eat, sleep in close proximity—face increased danger of contracting COVID-19, as already evidenced by the trenchant spread of the virus on cruise ships and in nursing homes.  This problem is particularly acute with respect to people who are confined in jails and other correctional facilities, for whom it is impossible to engage in the necessary social distancing as well as the hygiene required to mitigate the risk of transmission.  More people in confinement are testing positive for COVID-19 with each passing day, and there are increasing numbers of confirmed positive cases and deaths among prisoners and guards in Ohio's prisons and jails, with twenty-two of twenty-eight state prison facilities already locked down under quarantine.  Prisons and jails are devastatingly effective incubators for the disease. For example, as of April 9, 2020, 19 prisoners had tested positive in Ohio state prisons. Just two weeks later, 3,816 prisoners have now tested positive, accounting for over 25% of Ohio's total COVID-19-positive population.  Staff, such as guards, who pass in and out of the prisons, both carry the disease into the incubators, and carry it out, spreading it out to the community.

11.     For these reasons, leading public health experts are recommending the prompt release of detainees from custody, especially for people with health complications.  This both protects those with the high vulnerability and also ameliorates risk for all people detained or

working in jails, as well as people in their surrounding communities. Release also reduces the burden on the region's limited health-care infrastructure, as it lessens the likelihood that an overwhelming number of people will become seriously ill from COVID-19 at the same time and exhaust the available resources.

12.     Plaintiffs have health fragilities or specific underlying medical conditions that put them at high risk of grave or lethal illness if they contract COVID-19 infection.[1] Moreover, even for the healthiest person, now that positive cases are present in these congregate facilities, the risk of contracting the disease is unacceptably high.

13.     If Plainitffs continue to be detained at Butler and Morrow jails during the current outbreak of COVID-19, they face a danger that is "so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk" and that violates their constitutional right to safety in government custody. *Helling v. McKinney*, 509 U.S. 25, 36 (1993).

14.     Plaintiffs ask this Court to issue a Writ of Habeas Corpus and order their immediate release, subject to appropriate precautionary public health measures, such as home quarantine and abiding by Ohio's stay-home order upon release, on the ground that their continued detention

---

[1]   Underlying medical conditions that create a high risk of serious COVID-19 infection include, but are not limited to: blood disorders, such as sickle cell disease or taking blood thinners; chronic kidney disease; chronic liver disease, including cirrhosis and chronic hepatitis; cancer or cancer treatments; organ or bone marrow transplant; individuals taking immunosuppressant medications; HIV or AIDS; current or recent pregnancy in the last two weeks; diabetes; inherited metabolic disorders and mitochondrial disorders; heart disease, including coronary artery disease, congenital heart disease, and heart failure; lung disease, including asthma and COPD (chronic bronchitis or emphysema); neurological and neurologic development conditions such as cerebral palsy, epilepsy (seizure disorders), stroke, intellectual disability, moderate to severe developmental delay, muscular dystrophy, or spinal cord injury; severe obesity (body mass index [BMI] of 40 or higher); and any other condition or treatment that weakens the immune response. Harvard Medical School, *If you are at higher risk: How to reduce risk of infection and what to do if you get sick*, Harvard Health Publishing (March 2020), https://www.health.harvard.edu/diseases-and-conditions/if-you-are-at-higher-risk.

violates the Due Process Clause of the U.S. Constitution.  In the alternative, Plaintiffs ask this

Court to issue injunctive relief ordering Defendants to release them immediately, with appropriate

precautionary public health measures, on the grounds that their continued detention violates the

Due Process Clause.

**PARTIES**

15.     **Keita Mory** is a 33 year old Guinean man detained by ICE in the Morrow Jail.

He was diagnosed with asthma in 2012, and must use an inhaler. He has experienced coughing,

wheezing, and difficulty breathing, along with heightened anxiety while in detention. Since he

has been in detention, he has not been provided an inhaler to use. Because of his respiratory

conditions, he is at an especially high risk of grave illness or death if he contracts COVID-19.

16.     **Sidi Njie** is a 34-year-old Gambian man detained by ICE in the Morrow Jail. He

was diagnosed with thyroid cancer in 2013, and had partially corrective surgery in late 2014. He

continues to require regular carcinoma treatments in addition to thyroid medication. He has not

been able to receive adequate treatment while in ICE detention. He is at grave risk of serious

illness or death if he contracts COVID-19.

17.     **Adenis Enrique Prieto Refunjol** is a 46-year-old Venezuelan man detained by

ICE in the Butler Jail. He has suffers from bronchial asthma and hypertrophic hypertensive

cardiopathy. He has been in detention for almost six months. When he was first detained, he did

not receive his necessary medications for over a week. Since he has been at the jail, he has also

had bloating and intestinal pain, in addition to flare-ups of his preexisting conditions. As a

consequence, he is at high risk of severe illness or death if he contracts COVID-19.

18.     **Respondent-Defendant Rebecca Adducci** is the Detroit District Director of ICE.

Her District comprises Ohio and Michigan. In that position, she is responsible for carrying out

ICE's immigration detention operations at Butler and Morrow Jails.  Defendant Adducci is a legal

custodian of Plaintiffs, and the proper respondent for a habeas petition. *See Roman v. Ashcroft*, 340 F.3d 314, 321 (6th Cir. 2003). She is sued in her official capacity.

19. **Defendant ICE** is a federal law enforcement agency within the U.S. Department of Homeland Security. ICE is responsible for criminal and civil enforcement of immigration laws, including the detention and removal of immigrants. Enforcement and Removal Operations, a division of ICE, manages and oversees the immigration detention system. Defendant ICE is a legal custodian of Plaintiffs.

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1346 (original jurisdiction), 28 U.S.C. § 2241 (habeas jurisdiction) and Article I, Section 9, clause 2 of the United States Constitution (the Suspension Clause).

21. Venue lies in the U.S. District Court for the Southern District of Ohio, the judicial district in which Plaintiffs are currently in custody. Venue is proper in the Southern District of Ohio under 28 U.S.C. § 1391, as venue is proper in any district in which in which a substantial part of the events or omissions giving rise to the claim occurs.

## FACTS

### A. COVID-19 Is Highly Contagious and Poses a Grave Risk of Harm if Contracted

22. COVID-19 reached pandemic status weeks ago. As of April 23, 2020, over 2.7 million people worldwide have received confirmed diagnoses of COVID-19, and over 190,000 of those people have died. Transmission continues to increase exponentially and is not projected to reach its peak in Ohio until mid-May.

23. On April 11, 2020, Franklin Jail, where ICE temporarily houses people before transferring them to Butler or Morrow, announced its first confirmed positive cases of COVID-19

among prisoners.[2] Despite this, ICE continued to detain new people, hold them in Franklin County, and transfer them to the Butler and Morrow Jails—without ever quarantining, or consistently testing, anyone.

24.      On April 13, 2020, Butler Jail reported its first prisoner tested positive for COVID-19.[3] Despite this, ICE continued to transfer detainees between Butler Jail and Morrow Jail and the transferred detainees were never quarantined when they arrived at the Morrow Jail.

25.      Since Butler Jail announced its first case, the number of individuals who have tested positive has been on the rise in both Morrow and Butler counties. As of April 23, 2020, Butler County has 201 cases with 61 hospitalizations and Morrow County has 25 cases with four hospitalizations. The number of cases and hospitalizations in Morrow County is expected to rise due to its proximity to the adjacent Marion County where 2,161 cases have now been confirmed.

26.      Yesterday, April 23, 2020, Morrow Jail had its first prisoner teste positive for COVID-19.

27.      This prisoner had been transferred from the Franklin County jail to Morrow along with another man approximately ten days earlier. Without quarantining these men, ICE deposited them into the Morrow general population along with Plaintiffs Keita and Njie. After several days, Plaintiffs noticed that one of these men seemed sick and feverish. At one point, about four days

---

[2]Holly Zachariah, *Coronavirus: Two Franklin County Jail Inmates Test Positive for COVID-19*, The Columbus Dispatch (Apr. 11, 2020), available at https://www.dispatch.com/news/20200411/coronavirus-two-franklin-county-jail-inmates-test-positive-for-covid-19

[3] Keith BieryGolick, *Coronavirus in Ohio Inmate at Butler County Jail Tests Positie for COVID-19, Sheriff Says*, Cincinnati Enquirer ( Apr. 13, 2020), available at https://www.cincinnati.com/story/news/2020/04/13/coronavirus-ohio-inmate-butler-county-jail-positive-covid-19/2982534001/

ago, Mr. Njie had to help the man because he was having difficulty standing. After that, a nurse took the man's temperature and found he had a 104 degree fever.

28.     That man had been in Morrow's general population for about 10 days, had had a high fever for at least several days, and was not removed from the shared pod until the corrections staff finally took his temperature just two days ago. Immediately afterword, staff administered a test, and yesterday night, told the rest of the detainees he was positive. Since then, Morrow staff have also isolated that man's bunkmate, who was presenting with a lower-grade fever. The remaining exposed detainees, upon the announcement that their roommate had tested positive, were provided masks for the first time. No other steps were taken, and no other tests administered.

29.     As of April 23, 2020, 3,816 prisoners have tested positive in Ohio's state prisons, with new cases every day.[4] At Marion and Pickaway Correction Facilities, nearly 80% of the prisoner populations have now tested positive.[5] If Butler and Morrow Jails follow the pattern of prison facilities in Ohio, the number of those infected is about to rise exponentially.

30.     In many people, COVID-19 causes fever, cough, and shortness of breath.  Some individuals, for unknown reasons, suffer much more serious disease or death.  Certain underlying medical conditions, as well as age, additionally increase the risk of serious complications, disease, or death from COVID-19.

31.     Moreover, COVID-19 can severely damage lung tissue, which requires an extensive period of rehabilitation, or even a permanent loss of respiratory capacity.  COVID-19

---

[4] Ohio Department of Rehabilitation and Corrections, *COVID-19 Inmate Testing*, https://drc.ohio.gov/Portals/0/DRC%20COVID-19%20Information%2004-23-2020%201300.pdf (last updated Apr. 23, 2020).
[5] Jake Zuckerman, *Nearly 80% of Inmates Have COVID-19 at Two Ohio Prisons*, News 5 Cleveland, https://www.news5cleveland.com/news/continuing-coverage/coronavirus/nearly-80-of-inmates-have-covid-19-at-two-ohio-prisons (Apr. 23, 2020).

may also target the heart muscle, causing a medical condition called myocarditis, or inflammation of the heart muscle, which can also affect the heart's electrical system, reducing the heart's ability to pump. Reduced pumping can lead to rapid or abnormal heart rhythms in the short term, and to long-term heart failure that limits exercise tolerance and the ability to work. In addition, COVID-19 can trigger an over-response of the immune system, further damaging tissues in a cytokine-release syndrome that can result in widespread damage to other organs, including permanent injury to the kidneys and neurologic injury.

32.     These complications can manifest at an alarming pace. Patients can show the first symptoms of infection as soon as two days after exposure, and their condition can seriously deteriorate in as little as five days or sooner.

33.     But the virus's symptoms may take up to fourteen days to manifest. Several studies have shown that people infected with COVID-19 are most contagious one to three days before they begin to show symptoms. By some estimates, as many as twenty-five percent of people infected may not show symptoms at all. However, they are nevertheless highly contagious to others.

34.     Even younger and healthier people who contract COVID-19 may require supportive care, which includes supplemental oxygen, positive pressure ventilation, and, in extreme cases, extracorporeal mechanical oxygenation. But people with underlying health vulnerabilities, such as Plaintiffs, are more likely to need advanced support, which requires highly specialized equipment that is in limited supply, and an entire team of care providers, including 1:1 or 1:2 nurse-to-patient ratios, respiratory therapists, and intensive care physicians. In a pandemic, the numbers of patients requiring this level of support can quickly exceed local health-care resources.

35.     Because the disease is so emergent, and public health research around the disease is evolving so rapidly, the nature and extent of the conditions that correlate with serious complications or death are still unknown.

36.     The need for care, including intensive care, and the likelihood of death, are much higher from COVID-19 infection than from influenza.  Sources differ, but all reports are grave: sources report fatality rates ranging from nearly 2% to over 15% for populations at higher risk for complications from COVID-19, such as those with fragile health statuses or particular comorbidities.  Moreover, recent studies estimate that the COVID-19 fatality rate for the general population ranges from six to thirteen times as high as a severe seasonal influenza fatality rate, even in advanced countries with highly effective healthcare systems.

37.     The specific mechanism of mortality of critically ill COVID-19 patients is uncertain but may be related to virus-induced acute lung injury, inflammatory response, multiple organ damage and secondary nosocomial infections.  Among those who survive serious cases of COVID-19, some will require long-term rehabilitation because of damage to lung tissue and possibly other organs, including the heart, kidney, and neurologic systems.  Some will suffer permanent damage to their lungs or other organs.

38.     There is no vaccine against COVID-19, nor is there any known medication to prevent or treat infection from COVID-19.  On March 26, 2020, Dr. Anthony Fauci, head of the National Institute of Allergy and Infectious Diseases (NIAID), estimated that a vaccine could be developed in 18 months.  Vaccines typically take between eight to ten years to develop.  Vaccines usually must be tested in four phases before they attain regulatory approval: (1) animal testing, (2) small-group human testing to assess safety and monitor immune response, (3) medium-sized group testing to assess members of at-risk groups, and (4) large-scale testing on thousands of

people.  Moreover, more time is needed after approval to distribute the vaccine across the country.  With these long trials and distribution schedules in mind, other experts have expressed the view that the 18-month estimate given by Dr. Fauci is optimistic.

39.  According to the CDC, the disease is mainly transmitted among people via respiratory droplets produced when an infected person coughs or sneezes.  Scientists believe that the virus is aerosolized, surviving in air for several hours.[6]  Experts also believe that infected people may leave the virus on surfaces or objects, allowing it to spread when another person touches that object and then touches their own mouth, nose or possibly their eyes.  The main strategy to limiting the disease's spread is social distancing —remaining physically separated at least six feet at all times from other individuals —and hygiene, including thoroughly washing hands with soap and water.  Because individuals may be contagious while asymptomatic, these measures must be taken before individuals display symptoms.

40.  Projections by the Centers for Disease Control and Prevention ("CDC") indicate that over 200 million people in the United States could be infected with COVID-19 over the course of the pandemic without effective public health intervention, with as many as 1.7 million deaths in the United States alone.

**B.  Plaintiffs Face an Imminent, Serious Risk of COVID-19 Infection**

41.  As of April 23, 2020, there were 14,142 confirmed cases of COVID-19 and 618 deaths from COVID-19 in Ohio.[7] 25% percent of these cases are from within Ohio's state prisons.

---

[6] *See, e.g.* N. Engl. J. Med., Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1,(Apr. 16, 2020) available at https://www.nejm.org/doi/10.1056/NEJMc2004973

[7]  Ohio Department of Health, *Coronavirus (COVID-19)*, https://coronavirus.ohio.gov/wps/portal/gov/covid-19/home (last updated Apr. 23, 2020).

42.     The COVID-19 outbreak in Ohio has resulted in unprecedented health measures to facilitate and enforce social distancing.  On April 2, Governor Mike DeWine extended Ohio's Stay-At-Home Order through May 1, which went into effect on April 6.[8]  The new order included new regulations that restrict the number of customers allowed inside essential businesses and asks anyone traveling into Ohio to self-quarantine for two weeks with few exceptions.[9]

43.     Over the last few weeks, hundreds of COVID-19 diagnoses and multiple deaths have been confirmed at local, state, and federal correctional facilities across the United States and in Ohio.  Governor DeWine has authorized the Ohio National Guard to provide medical assistance at Elkton federal prison in Lisbon, Ohio due to the number and rate of coronavirus infections at that federal facility.  There, at least thirty-seven people have been hospitalized due to COVID-19, seventy-one have been quarantined with symptoms, and at least three have died.[10]  Reporting indicates that a few days prior, only seventeen people had been in isolation and twenty hospitalized.[11] On April 21, a federal judge entered a preliminary injunction ordering that facility, among other things, to identify hundreds of people eligible for immediate release, and to release them in 14 days.[12]

44.     The conditions at detention facilities such as Butler and Morrow Jails, which are enclosed group environments where people must live, sleep, and eat in close proximity, pose a

---

[8]   NBC4 Staff, *Read the Full Order: Ohio Stay-at-Home Order Extended Until May 1*, NBC 4 (Apr. 2, 2020), https://www.nbc4i.com/community/health/coronavirus/gov-dewine-extends-ohios-stay-at-home-order-until-may-1/.

[9]   *Id.*

[10]  Vince Grzegorek, *At Elkton Prison in Ohio, 37 Inmates Hospitalized Due to COVID-19, 3 Dead, 71 in Isolation*,  Cleveland Scene (Apr. 7, 2020), https://www.clevescene.com/scene-and-heard/archives/2020/04/07/at-elkton-federal-prison-in-ohio-37-inmates-hospitalized-due-to-covid-19-3-dead-71-in-isolation.

[11]  *Id.*

[12]  Order, *Wilson v. Williams,* N.D. Ohio No. 4:20-cv-00794 (Apr. 22, 2020)

heightened risk for the spread of COVID-19. Other enclosed group environments, such as cruise ships and nursing homes, have seen extremely high COVID-19 transmission rates. The danger is even greater at Butler and Morrow Jails, where people can rarely be more than six feet apart at *any* time, scant medical resources are available, and many detainees are at high risk of serious infection. Further, these jails in particular have a transient population. Butler Jail transfers many of its ICE detainees to Morrow Jail, a practice that was still occurring in recent weeks. Both jails also continue to accept new people into the facility.

45.     At Morrow Jail, detainees are housed in pods of over 80 people. Detainees sleep in bunk beds that are each separated by only one foot. They are never allowed outside of the pod and are in constant close proximity to other detainees. Detainees continue to eat meals together communally, use one shared water fountain, and are, only as of recently, provided diluted soap and no alcohol-based hand sanitizer. As recently as this month, Morrow Jail was accepting transfer detainees from Butler Jail and continued to admit new prisoners from the community. These new or transferred detainees joined the general population and were not quarantined for any portion of the suggested 14 days.

46.     At Butler Jail, detainees are held in small two-person cells, each holding a bunk bed. Detainees all use shared showers and the same telephones. Detainees are not permitted to go outside, and the facility does not have windows that can open in any of the spaces where detainees are held. Since the COVID-19 pandemic, detainees are now only released from their cells 24 detainees at a time, instead of 46 detainees at a time. Correction officers do not consistently wear masks or gloves. As recently as this month, Butler was continuing to accept new detainees who were transferred in, and continuing to transfer detainees out.

47.     Given these conditions, there are no circumstances under which Defendants can continue to detain Plaintiffs and also ensure their safety.  Butler and Morrow Jails simply cannot adhere to the CDC's social distancing guidelines.  It is impossible for the detainees to shelter in place, to save themselves from forced proximity to interactions others –be it staff or other detainees - who may be carriers for the disease.

48.     Given the risk of infection posed by COVID-19, the new positive cases in the detention centers, and the fact that detainees cannot isolate themselves from infected residents or staff, it is only a matter of time before the number of detainees infected with the virus grows exponentially.  The early evidence bears this out: for example, 25% of all Ohio's cases come from within a prison or jail facility, because it is only within these congregate facilities that individuals are denied the ability to socially distance.

49.     ICE has not grappled with the fact that COVID-19 spreads pre- and asymptomatically, having instituted no protocol for testing of detainees or staff who enter the detention facility exhibiting no symptoms.  It may well be that the virus already exists in Morrow and Butler Jails in numbers even larger than we are currently aware.  According to reports from Morrow Jail, detainees were only provided with masks *after* the first prisoner was confirmed to have contracted COVID-19.

50.     Other jails around the country have tried mitigation efforts to no avail.  The virus continues to infiltrate and spread through correctional facilities.  The top doctor at New York City's Rikers Island jail has lamented how extensive mitigation efforts failed to slow the spread of the disease at the jail.  He joins a chorus of public health experts in concluding that for such efforts to be effective, they must be paired with a reduction in the number of people incarcerated.

51.     When correctional facilities have been unwilling to release people to address the heightened danger of COVID-19 infection, courts have not hesitated to intervene to protect the civil liberties, health, and lives, of similar detainees in similar situations.  For example, several days ago, a federal court in California ordered ICE to immediately reduce the population at one of its detention facilities, including by releasing detainees with medical vulnerabilities and detainees with no- or low-level criminal histories. *Hernandez Roman, et al. v. Wolf, et al.,* W.D.C.A. No. edcv-20-786-jth (Apr. 23, 2020). Similarly, the Northern District of Ohio this week ordered Elkton Federal Prison to take steps to depopulate after a tragic outbreak of COVID-19 there. Order, *Wilson v. Williams,* N.D. Ohio No. 4:20-cv-00794 (Apr. 22, 2020). And a large and growing collection of federal courts nationwide have ordered the release of medically vulnerable and other ICE detainees, whether or not COVID-19 is yet present in their detention facilities—recognizing the grave and concrete risk it presents. *E.g., Malam v. Adducci*, No. 5:20-cv-10829, ECF. 22, 29 (E.D. Mich., Apr. 5 2020, Apr. 9, 2020) (ordering release of ICE detainees); *Thakker v. Doll,* ___ F.Supp.3dd ___, 2020 WL1671563 (M.D. Pa. Mar. 31, 2020) (same, ICE detainees in Pennsylvania, ordering release of prisoners with conditions including high cholesterol and repeated flu smptoms); *Basank v. Decker*, No. 20-cv-2517 (AT), --- F. Supp. 3d ----, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020)(releasing asthmatic plaintiffs and others from facility with positive test cases for COVID-19); *Rafael L.O. v. Tsoukaris*, No. 2:20-cv-3481-JMV, 2020 WL 1808843 (D.N.J. Apr. 9, 2020) (same) *Hope v. Doll*, No. 1:20-cv-562, Dkt. 12 (M.D. Pa. Apr. 7, 2020), *motion for reconsideration denied* (Apr. 10, 2020)(releasing asthmatic plaintiffs and others with various health vulnerabilities); *Bravo Castillo v. Barr*, No. 20-605-TJH (AFMx), --- F. Supp. 3d ----, 2020 WL 1502864 (C.D. Cal. Mar. 27, 2020)(ordering release of prisoners with medical conditions including kidney stones and facial fracture).

**C.  Plaintiffs are At Risk and Can Be Safely Released**

52.      Plaintiffs in this case are three individuals who are particularly vulnerable to serious illness or death if infected by COVID-19 and are currently detained at Butler or Morrow Jails as they await the resolution of their civil immigration cases.

53.      **Mory Keita** is a 33-year-old Guinean man detained in the Morrow Jail. He has asthma and needs an inhaler; he was diagnosed with asthma in approximately 2012. Since he has been detained, ICE has refused to provide him an inhaler despite his requests, because of alleged inconsistent use of this medication before he was detained. While in detention, he has experienced coughing, wheezing, and difficulty breathing. In addition, since he has been detained, he has suffered from anxiety and periodic cold symptoms.

54.      Mr. Keita was brought to the United States by his parents at the age of 3, and has lived here ever since. ICE detained him in February, 2020, immediately after his release from the Pickaway Jail, where he completed a sentence for possessing drug documents and improperly handling a firearm. He has a prior nonviolent criminal history of possessing controlled substances and credit card fraud, for which he has served his time. He is now a civil ICE detainee without a final removal order.

55.      If he is released, he would be able to live at the home of his friend, Shanise Patterson, in Columbus, Ohio and quarantine for 14 days in her home, and continue to follow Ohio's stay home order and care for himself, while the pandemic persists.

56.      **Sidi Njie** is a 34-year-old Gambian man detained in the Morrow Jail. He was diagnosed for thyroid cancer in 2013, and had partially corrective surgery in late 2014. He continues to require regular carcinoma treatments in addition to thyroid medication. He has not been able to receive adequate treatment while in ICE detention.

57. Mr. Njie has been in ICE detention for almost one year. He first entered the USA on a B2 tourist visa in 2002, and has lived in Ohio since 2013. ICE agents appeared one day at his home in June 2019 and put him in detention while his immigration appeal was pending; He has no criminal history besides traffic tickets, other than a 2018 mayor's court charge for possession of drug paraphernalia, for which he paid a fine.

58. Mr. Njie is represented by attorney Nazly Mamedova in his immigration case. He lives outside of Columbus with his wife and children, and will be able to return to his home— where he would have his own room for the purposes of quarantining—to quarantine for 14 days, and continue to follow Director Acton's stay home order.

59. **Adenis Enrique Prieto Refunjol** is a 46-year-old Venezuelan man detained in the Butler Jail. He suffers from bronchial asthma and hypertrophic hypertensive cardiopathy.

60. Mr. Prieto Refunjol has been in ICE detention for almost six months. When he was first detained, he did not receive his necessary medications for over a week. Since he has been at the jail, he has had bloating and intestinal pain, in addition to flare-ups of his preexisting conditions.

61. Mr. Prieto Refunjol has come to the USA multiple times since 2014 on a B2 visa as a tourist; his most recent visa entry was in July 2018, after which he stayed. He is pursuing an immigration claim to remain in the U.S., and does not have a removal order. ICE detained him after an OVI stop in Warren County in November of 2019. His only other criminal history was a civil fine for trespass in Florida.

62. Mr. Prieto Refunjol is represented by attorney Nazly Mamedova in his immigration case, and he wants to return to live with his U.S. citizen fiancée. If released, his brother, who lives in Texas, will pick him up from custody and drive him to Florida where he

lives. He will be able quarantine for 14 days in in his friend's home, then move long-term into his fiancé's Florida home, and continue to follow the state's stay home order there.

## LEGAL BACKGROUND

### A. Plaintiffs Have a Constitutional Right to Reasonable Safety in Custody

63.    "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 199-200 (1989).  As civil detainees, Plaintiffs' detention is governed by the Fifth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 539 (1979).[13]  Under the Fifth Amendment, civil detention may not "amount to punishment of the detainee." *Bell,* 441 U.S. at 535.

64.    COVID-19 has entered the facilities where Plaintiffs are confined; they are inarguably going to contract it if they remain in confinement. Additionally, they are particularly vulnerable to it in various ways. Thus the fact of their confinement cannot be "reasonably related to a legitimate governmental objective"; instead they are "arbitrary or purposeless[.]"  *See Bell*, 441 U.S. at 539.  *See also J.H. v. Williamson Cty., Tennessee*, 951 F.3d 709 (6th Cir. 2020) (applying *Bell* test to pre-trial detainee's conditions of confinement claim); *Turner v. Stumbo*, 701 F.2d 567, 572 (6th Cir. 1983) (same).

---

[13] Plaintiffs' continued detention would also violate the Eighth Amendment's prohibition of cruel and unusual punishment—a much stricter standard than the Fifth Amendment's ban on any punishment, which applies here.  This is because Defendants have ignored "a condition of confinement that is sure or very likely to cause serious illness" by crowding Plaintiffs into living quarters with others who have "infectious maladies . . . even though the possible infection might not affect all of those exposed." *Helling*, 509 U.S. at 32-33. *See Bell*, 441 U.S. at 539; *Thakker*, 2020 WL 1671563, at *8 n.15 (ordering immediate release of immigration detainees due to COVID-19 under the Fifth Amendment and, citing *Helling*, finding that plaintiffs had also met the "more exacting Eighth Amendment standard").

65.     Plaintiffs' detention is not "reasonably related" to its objective because it creates a serious risk of imminent illness and death.  *See Bell*, 441 U.S. at 539.  This risk is urgent, imminent, and unrelated to any legitimate governmental goal, as several federal courts have already held.  *See, e.g.*, *Malam*, 2020 WL 1672662, at *12; *Xochihua-Jaimes v. Barr*, No. 18-71460, ——F. App'x. ——, 2020 WL 1429877 at *1 (9th Cir. Mar. 24, 2020) (*sua sponte* ordering immediate release of immigrant petitioner "[i]n light of the rapidly escalating public health crisis, which public health authorities predict will especially impact immigration detention centers"); *Thakker*, 2020 WL 1671563, at *8 (ordering immediate release of immigrant petitioners because "we can see no rational relationship between a legitimate government objective and keeping Petitioners detained in unsanitary, tightly-packed environments.").

66.     When the government fails to meet its obligation to provide adequate medical care, courts have a responsibility to remedy the resulting constitutional violation.  *See Brown v. Plata*, 563 U.S. 493, 511 (2011) ("When necessary to ensure compliance with a constitutional mandate, courts may enter orders placing limits on a prison's population.").   The power to remedy constitutional violations arising from government confinement falls within the Court's broad power to fashion equitable relief.  *See Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978).

67.     To vindicate detainees' due process rights in the face of the COVID-19 pandemic, federal and state courts across the country have ordered the release of detained individuals.  *See, e.g.*, *Malam*, 2020 WL 1672662 (ordering release of detainee in Michigan due to threat of COVID-19); ); *Bahena Ortuno v. Jennings*, No. 20-cv-020640-MMC (N.D. Cal. Apr. 8, 2020) (same); *Hernandez v. Wolf*, No. 20-60017-TJH (C.D. Cal. Apr. 1, 2020) (same; *Thakker v. Doll*, No. 1:20-cv-480, ——F. Supp. 3d——, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020) (same for 13 detainees in Pennsylvania); *Coronel v. Decker*, No. 20-cv-2472, ——F. Supp. 3d——,  2020 WL 1487274

(S.D.N.Y. Mar. 27, 2020) (ordering release of four medically vulnerable immigrant plaintiffs held in New York and New Jersey detention centers due to threat of COVID-19); *Basank v. Decker*, No. 20-cv-2518, 2020 WL 1481503, at *1 (S.D.N.Y. Mar. 26, 2020) (same, for ten immigrant plaintiffs who "suffer[] from chronic medical conditions, and face[] an imminent risk of death or serious injury in immigration detention if exposed to COVID-19"); *Calderon Jimenez v. Wolf*, No. 18-10225-MLW, Dkt. 507 (D. Mass. Mar. 26, 2020) (ordering grant of bail for an immigrant detainee held in Plymouth County, Massachusetts because "being in jail enhances risk"). On March 23, 2020, the Ninth Circuit ordered, *sua sponte*, the release of an immigrant petitioner "[i]n light of the rapidly escalating public health crisis, which public health authorities predict will especially impact immigration detention centers." *Xochihua-Jaimes*, No. 18-71460, ——F. App'x——, 2020 WL 1429877, at *1 (9th Cir. Mar. 23, 2020).

**B. ICE Has the Authority to Release Detained People in Its Custody**

68. It is well within ICE's authority to comply with constitutional requirements by releasing people who are vulnerable to severe illness or death if they contract COVID-19. For example, the regulations governing ICE's release authority state that serious medical conditions are a reason to parole an individual, as "continued detention would not be appropriate" in such cases. 8 C.F.R. § 212.5(b)(1).

69. This exercise of discretion comes from a long line of agency directives explicitly instructing officers to exercise favorable discretion in cases involving severe medical concerns and other humanitarian equities militating against detention.

70. ICE's discretion applies regardless of the statutory basis for a noncitizen's detention.

71. ICE not only has the authority to exercise its discretion to release individuals from custody, but has routinely done so in other jurisdictions—in some places, by large numbers, to

depopulate detention centers as a result of the pandemic. But the defendant Detroit District Director's ICE field office, which controls all of the detainees in Ohio and Michigan, has only released a handful of people out of the hundreds it detains. Upon information and belief, every release among this handful has been the result of a lawsuit.

**C.  This Court Has the Authority to Order Plaintiffs' Release**

72.    It is well established that this Court has authority to order Plaintiffs' release to ensure the protection of their constitutional rights.  District courts have "ample authority" to address "each element" contributing to a constitutional violation.  *Hutto v. Finney*, 437 U.S. 678, 687 (1978).

73.    Courts regularly have exercised this authority to remedy constitutional violations caused by overcrowding.  *See Duran v. Elrod*, 713 F.2d 292, 297-98 (7th Cir. 1983) (concluding that court did not exceed its authority in directing release of low-bond pre-trial detainees as necessary to reach a population cap), *cert. denied*, 465 U.S. 1108 (1984).

74.    Where the government fails to meet its obligations to provide for adequate medical care, courts have a responsibility to remedy the resulting constitutional violation.  *See Brown v. Plata*, 563 U.S. 493, 511 (2011).  As a result, "[w]hen necessary to ensure compliance with a constitutional mandate, courts may enter orders placing limits on a prison's population."  *Id.*

75.    These constitutional principles make clear, consistent with the opinions of leading public health experts, that releasing Plaintiffs is the only viable remedy to ensure their safety from the threat to their health that COVID-19 poses.  Plaintiffs are people with underlying medical conditions who are at especially grave risk of severe illness or death if they contract COVID-19.

76.    In the face of this great threat, social distancing measures are Plaintiffs' only defense.  Social distancing is impossible at Butler and Morrow Jails, where Plaintiffs are forced to

share close sleeping quarters, toilets, sinks and showers, and to eat and recreate in contained, communal spaces, and are forced to be in close contact with the many other detainees and officers around them. Because these conditions have been demonstrated to set the stage for infectious spread, Plaintiffs face unreasonable harm from continued detention. Because the virus is clearly already present in the jails, time is of the essence if Plaintiffs will have a chance of protecting themselves.

## CLAIMS FOR RELIEF

Violation of Fifth Amendment Right to Substantive Due Process
(Unlawful Punishment)

77. Plaintiffs repeat and reallege each and every allegation above, as if set forth in full herein.

78. The Fifth Amendment of the Constitution guarantees that civil detainees, including all immigrant detainees, may not be subjected to punishment. The federal government violates this substantive due process right when it subjects civil detainees to cruel treatment and conditions of confinement that amount to punishment or does not ensure those detainees' safety and health.

79. Defendants are subjecting Plaintiffs to imminent risk of contracting COVID-19, for which there is no vaccine, known treatment, or cure. Because of Plaintiffs' particular vulnerabilities, they risk serious illness and death if infected with COVID-19. Defendants are subjecting Plaintiffs to a substantial risk of serious harm, in violation of Plaintiffs' rights under the Due Process Clause.

80. Leading public health and corrections experts agree that Plaintiffs are at grave risk of contracting the virus if they remain at jails like Butler and Morrow. Accordingly, Defendants' detention of Plaintiffs amounts to punishment and fails to ensure their safety and health.

81.     There is no reasonable relationship between any legitimate government objective and keeping Plaintiffs detained in their current conditions.

82.     For these reasons, Defendants' ongoing detention of Plaintiffs violates the Due Process Clause.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court grant the following relief:

a.      Issue a Writ of Habeas Corpus and order Plaintiffs' immediate release, with appropriate precautionary public health measures, on the ground that their continued detention violates the Due Process Clause;

b.      In the alternative, issue injunctive relief ordering Defendants to immediately release Plaintiffs, with appropriate precautionary public health measures, on the ground that their continued detention violates the Due Process Clause;

c.      Issue a declaration that Defendants' continued detention in civil immigration custody of individuals at increased risk for severe illness, including older individuals and persons of any age with underlying medical conditions that may increase the risk of serious COVID-19, violates the Due Process Clause;

d.      Award Plaintiffs their costs and reasonable attorneys' fees in this action under the Equal Access to Justice Act, as amended, 5 U.S.C. § 504 and 28 U.S.C. § 2412, and on any other basis justified under law; and

e.      Grant any other and further relief that this Court may deem fit and proper.

Dated: April 24, 2020

Respectfully submitted,

/s/ Elizabeth Bonham
Elizabeth Bonham (0093733)
Freda J. Levenson (0045916)
ACLU of Ohio Foundation
4506 Chester Avenue
Cleveland, OH 44102
Phone: (614) 586-1972
Fax: (614) 586-1974
flevenson@acluohio.org
ebonham@acluohio.org

Claire Chevrier*
ACLU of Ohio Foundation
1108 City Park Ave.
Ste. 203
Columbus, OH 43206
Phone: (614) 586-1972
Fax: (614) 586-1974
cchevrier@acluohio.org

* Application for admission *pro hac vice* forthcoming