IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**ADENIS ENRIQUE PRIETO REFUNJOL**, *et al.*,

    **Plaintiffs,**

v.

**DIRECTOR ICE REBECCA ADDUCCI**, *et al*.,

    **Defendants.**

:

:

:

Case No. 2:20-cv-2099

Judge Sarah D. Morrison
Magistrate Judge Chelsey M. Vascura

## OPINION AND ORDER

This matter is before the Court on a Motion for Temporary Restraining Order ("TRO") for three individuals in the custody of Immigration and Customs Enforcement ("ICE"). (ECF No. 2.) On April 27, 2020, the Court held a preliminary conference (the "Conference") on the TRO pursuant to Local Rule 65.1. For the reasons discussed below, the Motion for TRO is **GRANTED**. During the Conference, Petitioners also made an oral motion to file their medical records under seal. That motion is **GRANTED**.

### I.    FACTUAL BACKGROUND

Petitioners' motion comes against the backdrop of a global pandemic of an infection so widely known at this point that it requires little explanation. COVID-19 has ravaged the nation and the world at whirlwind speed, and the infection, hospitalization, and death counts are changing so quickly that they are outdated as quickly as they are published. Regardless, numbers are one of the best ways to describe the real danger that Petitioners fear. As of this writing, the United States has at least 977,256 COVID-19 cases and 50,134 deaths. The New York Times, *Coronavirus in the U.S.: Latest Map and Case Count* (Apr. 27, 2020, 1:37 PM),

https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html. Ohio has seen at least 16,325 infected, while at least 3,232 have been hospitalized and 753 have died. https://coronavirus.ohio.gov/wps/portal/gov/covid-19/home (Apr. 27, 2020, 2:00 PM).

While there is much that remains unknown about the virus, we know that some individuals are more susceptible to infection than others, including individuals housed in close quarters, like those in jails and prisons. *See* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited Apr. 27, 2020). We also know that some individuals are at risk of more severe consequences from infection than others, including those with particular health conditions. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited Apr. 27, 2020). Individuals with asthma, some types of heart conditions and hypertension, and those with compromised immune systems are particularly vulnerable. *Id.*; https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last visited Apr. 27, 2020). ICE also recognizes that individuals with asthma and those who are immunocompromised are in the "high-risk" category. (ECF No. 2-5, at 6–7.)

Petitioners ask this Court for relief because they argue that they fall into these high-risk categories and that Respondents are jeopardizing their health and safety. Each is held in ICE detention at the Butler County Jail ("Butler")[1] or the Morrow County Jail ("Morrow"), and each claims to have medical conditions placing him at high risk of severe consequences were he to contract COVID-19. (Pet. for Writ of Habeas Corpus ¶¶ 3, 12, ECF No. 1.)

Petitioner Adenis Enrique Prieto Refunjol is a Venezuelan national who has been in ICE detention since November 2019 and currently is detained at Butler. (Karla Donado Decl. ¶¶ 2,

---

[1] Although Butler County is in the Western Division of this District, the Court finds that Petitioners are similarly-situated and that it is a sensible allocation of the Court's resources to decide Petitioners' cases together.

3(a), ECF No. 2-3.) He is not subject to a final removal order. (ECF No. 1 ¶ 61.) Mr. Refunjol has hypertension and asthma. (Donado Decl. ¶ 4.) If he is released, Mr. Refunjol plans to drive to Florida with his brother where he intends to quarantine for fourteen days with his fiancé's neighbor. (*Id.* ¶ 6.) However, counsel represented during the Conference that he would stay in Ohio if required to do so.

Petitioner Mory Keita is believed to be a Guinean national, and he was brought to the United States at the age of three. (Mory Keita Decl. ¶ 3.) He has been in ICE detention since February 2020 and is currently detained at Morrow. (*Id.* ¶ 5.) He is not subject to a final removal order. (ECF No. 1 ¶ 54.) Mr. Keita has been in ICE custody before and has been previously released. (Keita Decl. ¶ 5.) He has asthma but has been denied access to an inhaler since being detained at Morrow. (*Id.* ¶ 6.) If he is released, Mr. Keita intends to quarantine for fourteen days in a friend's house in Columbus, Ohio. (*Id.* ¶ 13.)

Petitioner Sidi Njie is a Gambian national who has been in ICE detention since June 2019. (Nazly Mamedova Decl. ¶ 3.) Mr. Njie has been detained at Morrow since January 2020. (*Id.* ¶ 3.) He was transferred from Butler where he had been detained since June 2019. (*Id.*) Mr. Njie is recovering from thyroid cancer, and he has not been deemed cancer-free. (Brandy Jatta Decl. ¶ 5.) After his cancer diagnosis, Mr. Njie underwent surgery to have his thyroid removed. (*Id.*) He is still supposed to go to the doctor for regular scans and treatments, although he has not been able to do so since his detention. (*Id.*; Mamedova Decl. ¶¶ 9–10.) The thyroid cancer has compromised Mr. Njie's immune system, and he has been told that he is more susceptible to infection as a result of his surgery. (Mamedova Decl. ¶ 9.) If he is released, Mr. Njie intends to quarantine in a room in his family home outside of Columbus, Ohio. (*Id.* ¶ 13; Jatta Decl. ¶ 8.)

Butler and Morrow are both used as long-term detention facilities for ICE detainees.

(ECF No. 1 ¶ 2.) ICE transfers detainees between the two facilities and also transfers detainees from the Franklin County Jail ("Franklin") to both facilities. (*Id.*) All three facilities have now seen confirmed cases of COVID-19.[2] Morrow continues to accept new detainees from the public, from Butler, and from Franklin, and new detainees are not quarantined. (Jatta Decl. ¶¶ 7(a), (b); Keita Decl. ¶ 8.)

Morrow detainees are confined to one room containing around eighty men. (Jatta Decl. ¶ 6; Keita Decl. ¶ 7.) The detainees eat, sleep, and spend all of their time in this room. (Jatta Decl. ¶ 6; Keita Decl. ¶ 7.) The room contains about 100 beds, with approximately one foot between each bed. (Jatta Decl. ¶ 6.) The detainees share one bathroom, one telephone, and one water fountain. (*Id.* ¶ 6; Keita Decl. ¶ 7.) Until recently, detainees were not provided with soap but had to buy it from the Morrow commissary. (Mamedova Decl. ¶ 8(e).) While Respondents represent that a local news story has reported that Morrow is cleaning the facility three times per day, Petitioners contend that detainees are only provided with soap that is so watered-down that it does not lather. (*Id.*) They are not provided with alcohol-based hand sanitizers. (*Id.*)

At some point during the week of April 13, 2020, an ICE detainee was introduced into Morrow's general population. (Jatta Decl. ¶ 7(d).) This detainee was febrile and had a cough. (*Id.*) That individual was then transferred to Butler (*Id.*) During that same week, ICE transferred two detainees from Franklin to Morrow's general population, both of whom began exhibiting flu-like symptoms within a few days. (*Id.* ¶ 7(f).) Approximately one week later, one of these

---

[2] *See* Jail inmate tests positive for COVID-19, https://www.morrowcountysentinel.com/news/31606/jail-inmate-tests-positive-for-covid-19, (last visited Apr. 27, 2020); Butler Cty. Sheriff's Office, *First Confirmed COVID-19 Case in Butler County Jail*, https://www.butlersheriff.org/2020/04/13/first-confirmed-covid-19-case-in-butler-county-jail/ (last visited Apr. 27, 2020); *2 inmates at Franklin County jail test positive for COVID-19*, https://www.nbc4i.com/community/health/coronavirus/2-inmates-at-franklin-county-jail-test-positive-for-covid-19/ (last visited Apr. 27, 2020).

individuals was quarantined and was confirmed to be infected with COVID-19. (*Id.* ¶7(f), (g).) It does not appear that other detainees have been tested.[3] (*See id.* ¶ 7(h).)

While it Butler has taken steps to reduce its headcount and to isolate new transfers, it appears that detainees are still confined to shared cells. (*See* Donado Decl. ¶ 3(a).) And as with Morrow, there are individuals in the jail's general population with flu-like symptoms. (*See id.* ¶ 3(b).) Butler provides detainees with soap but not disinfectants. (*Id.* ¶ 3(c).)

Most of the information above comes from Petitioners, and the Court recognizes the potential for unreliability and even puffery in this information. For their parts, Respondents were unable to offer much information during the Conference. This is not a criticism but an observation. The Court recognizes that Respondents had little time to gather the necessary information and that accurate information is exceptionally difficult to gather in this ever-changing environment. Infection rates at Butler and Morrow are currently unknown as are testing rates. Respondents were not able to confirm Petitioners' health conditions and were not willing to concede that they were unusually susceptible to dangerous consequences were they to become infected.

## II. STANDARD OF REVIEW

The Court must consider four factors in determining whether to issue a TRO: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable harm; (3) whether the TRO would substantially harm third parties; and (4) whether the TRO would serve the public interest. *York Risk Servs. Grp., Inc. v. Couture*, 787 F. App'x 301, 304 (6th Cir. 2019). These four factors are not prerequisites, but rather they

---

[3] According to local news, no other individuals at Morrow "have met the criteria for testing." https://www.morrowcountysentinel.com/news/31606/jail-inmate-tests-positive-for-covid-19.

are to be balanced. *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985). Dispositive weight should not necessarily be given to one factor over the others. *York*, 787 F. App'x at 304–05.

## III. ANALYSIS

Petitioners have brought a Fifth Amendment claim alleging that their conditions of confinement amount to "punishment" and thus violate their Fifth Amendment rights. Under the Fifth Amendment's due process clause, "'a detainee may not be punished prior to an adjudication of guilt.'" *J.H. v. Williamson Cty.*, 951 F.3d 709, 717 (6th Cir. 2020) (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). This same standard applies in the civil detention context. *See Youngberg v. Romeo*, 457 U.S. 307, 320–21 (1982). A pretrial detainee can demonstrate that he has been unconstitutionally "punished" under the Fifth Amendment by showing intentional punishment or "by showing that a restriction or condition is not rationally related to a legitimate government objective or is excessive in relation to that purpose." *J.H.*, 951 F.3d at 717. The question is whether the latter—unintentional punishment—exists here.[4]

### 1. Likelihood of Success on the Merits

Respondents undoubtedly have a legitimate interest in detaining immigrants in removal proceedings in order to ensure that they will appear for future court proceedings and that the government will be able to deport them. And in "normal times," this interest may well carry the day in most cases of detainees seeking release from ICE custody. *See Rafael L.O. v. Tsoukaris*, No. 20-3481, 2020 WL 1808843, at *7 (D.N.J. Apr. 9, 2020). But this is not an interest that will

---

[4] Petitioners also argue that the Eighth Amendment may apply here but that they are primarily asserting their claims under the Fifth Amendment. The Court agrees that the Fifth Amendment governs and warrants the TRO and thus does not address the Eighth Amendment's deliberate indifference standard.

necessarily supersede any catastrophic conditions in a detention center. A court in another jurisdiction has constructed an apt analogy:

> [C]onsider if civil detainees were being housed in a facility in the direct path of a hurricane and that the facility was unlikely to withstand the force of the storm. The government would still have a legitimate governmental interest in ensuring that the detainees appeared for immigration court – but the government would not have a legitimate interest in housing the detainees in that particular facility during the hurricane. COVID-19, and its associated risks, is the difference maker – it changes the equation in evaluating the government's legitimate objectives.

*Id.* Morrow and Butler are in the eye of a storm. Based on the information currently before this Court, Petitioners are uniquely in the path of that storm, and temporary release is the only way to safeguard them.

While Respondents have an interest in detaining Petitioners, that interest gives way where the circumstances of detention may severely jeopardize Petitioners' health. *See Malam v. Adducci*, No. 20-10829, 2020 WL 1672662, at *9–12 (E.D. Mich. Apr. 5, 2020). Although Respondents are not yet willing to concede the fact of Petitioners' medical conditions, Respondents' own guidance acknowledges that some of Petitioners' asserted conditions place them in a high-risk category. (*See* ECF No. 2-5, at 6–7 (classifying immunocompromised detainees and those with "moderate to severe asthma" as "high-risk").)

Moreover, the balance of Petitioners' and Respondents' interests is particularly skewed because Petitioners are not apparent flights risks.[5] All have family in the United States, and Mr. Keita and Mr. Njie have family in Ohio. Mr. Njie and Mr. Refunjol are both pursuing immigration relief in the hopes of remaining in the country. And Mr. Keita has been in and out of

---

[5] Nor does it appear that Petitioners pose any danger to the community, although it is not clear how any such risk should factor into the Court's analysis here. Mr. Refunjol and Mr. Njie have minimal, nonviolent criminal histories. While Mr. Keita has a more extensive criminal history, there is still no evidence in the record that he is a danger to the community. This is bolstered by the fact that ICE has previously released Mr. Keita from detention multiple times.

7

ICE custody multiple times with no apparent attempts to flee. It is not clear that Respondents have any interest in detaining Petitioners beyond ensuring their appearance at future proceedings, so without any risk of flight, the interest in detention is small.

In contrast to this minimal risk of flight, the risk of infection and potentially catastrophic consequences is great. There is no dispute that Butler and Morrow each has at least one confirmed COVID-19 infection. Nor is there any dispute that infection easily spreads in a jail setting. Even assuming that Butler and Morrow isolate symptomatic prisoners (and there is presently a question whether they have taken that step), that is inadequate under the circumstances. COVID-19 can be transmitted by asymptomatic individuals. https://www.cdc.gov/coronavirus/2019-ncov/php/public-health-recommendations.html (last visited Apr. 27, 2020). Neither Butler nor Morrow has taken any precautions against such transmission, nor does the Court imagine that they could, short of quarantining each person in the facility.

And while many prisoners may not be severely impacted by the virus, Petitioners are different. Each has identified an underlying condition that may result in severe health effects were he to become infected. In short, the risk of infection for these three men is too great to bear under the circumstances.

The Court acknowledges that Respondents have not been able to respond fully to the Motion for TRO based on an inability to confirm many of the facts that Petitioners allege. But this is not a reason to deny a request for a TRO. In fact, Rule 65 specifically contemplates that there will be circumstances where granting a TRO is appropriate even before a respondent has had an opportunity to respond at all. *See* Fed. R. Civ. P. 65(b) (outlining circumstances where TRO may issue without notice to adverse party). Respondents will have a full opportunity to present any facts that they may gather at a preliminary injunction hearing. In addition, the Court

has offered to hold a hearing this week. If, based on their evidence, Respondents are able to satisfy the Court's concerns, the Court can decline to issue an injunction. But that is not reason to deny the request for a TRO given the dangerous circumstances that Petitioners allege.

### b. Irreparable Harm

Regarding irreparable harm, it is well documented that COVID-19 has terrorized the world with many dying and many growing severely ill. The most vulnerable among us have borne the brunt of this disease, including those with underlying medical conditions. Petitioners all have underlying medical conditions that place them in the group who is most at risk of serious consequences from infection. As explained above, then, there is a great risk of irreparable harm by Petitioners.

### c. Risk of Harm to Third Parties and Public Interest

In a constitutional case, as here, "an inquiry into the public interest is difficult to separate from the likelihood of success on the merits because 'the public interest is promoted by the robust enforcement of constitutional rights.'" *Rhinehart v. Scutt*, 509 F. App'x 510, 516 (6th Cir. 2013) (quoting *Am. Freedom Def. Initiative v. Suburban Mobility for Reg. Transp.*, 698 F.3d 885, 896 (6th Cir. 2012)). And "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994). It is also in the public interest to ensure the just and humane treatment of the populace as a whole, inclusive of those detained in our jails and prisons. *Cf. Farmer v. Brennan*, 511 U.S. 825, 832 (1994) ("The Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones . . . ." (internal citation omitted) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981))).

As explained above, based on the evidence in the record, the Court sees minimal risk to the community by ordering the release of Petitioners and subjecting them to quarantine. And in terms of the public interest, the Court finds that the public interest is served by Petitioners' release. The public interest is served by the vindication of their constitutional rights, to be sure, but the public interest is also served by minimizing the number of COVID-19 infections. More infections in Butler and Morrow means not only putting those who are detained and work there in danger, but also the surrounding community where those employed at the jails live. More infections beget more infections. That is the whole point of social distancing. It protects us all because it helps to minimize the spread of this dangerous infection and it ensures that our hospitals do not become overwhelmed.

### d.      Balancing the Factors

The Court concludes that all four factors weigh in Petitioners' favor at this time. Respondents' minimal interest in detaining individuals who are not a risk of flight is heavily outweighed by the strong interest of Petitioners and the community as a whole in protecting the health of Petitioners and the rest of us.

## IV.    CONCLUSION

For the reasons described above, the Court **GRANTS** Petitioners' Motion for TRO and **ORDERS** the following:

Petitioners are to be released immediately.[6] Petitioners are ordered to quarantine themselves for the next fourteen days in compliance with the guidelines issued by the Centers for Disease Control and Prevention ("CDC") and the Ohio Department of Health ("ODH").

---

[6] During the Conference, the Court ordered the Petitioners to provide certain information to Respondents prior to their release. Respondents represent that Petitioners have provided the requisite information, so the Court finds immediate release to be appropriate.

Petitioners are ordered to file declarations, as soon as possible after their release, confirming that they will comply with this quarantine order and that they will comply with CDC and ODH guidelines.

Petitioners are ordered to remain on home detention following the conclusion of this fourteen-day quarantine. Petitioners will not be subject to GPS monitoring.

In the case of Petitioner Adenis Enrique Prieto Refunjol, he may not leave Ohio until Respondents have approved his planned living arrangements in Florida. Any objections by Respondents regarding Mr. Refunjol's living arrangements or by Petitioners in the event Respondents withhold approval are to be filed with this Court as soon as possible.

The Court **GRANTS** Petitioners' Motion to File their relevant medical records under seal, and Petitioners shall file these medical records as soon as possible.

The Court will hold a preliminary injunction hearing on Monday, May 11, 2020, at 1:30pm. This TRO is to remain in effect until the conclusion of the preliminary injunction hearing.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**