**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

ADENIS ENRIQUE PRIETO
REFUNJOL, *et al.*,

                                :       **Case No. 2:20-cv-2099**

    Plaintiffs,

                                    **Judge Sarah D. Morrison**

    v.                           **Magistrate Judge Chelsey M. Vascura**

REBECCA ADDUCCI, *et al.*,        :

    Defendants.

<u>**OPINION AND ORDER**</u>

Petitioners have filed a petition for habeas corpus to be released from the custody of Immigration and Customs Enforcement ("ICE") because they contend that the relevant detention facilities cannot adequately prevent, manage, or treat a COVID-19 infection. This matter is before the Court to consider the propriety of a preliminary injunction ordering Petitioners' release (or continued release) while this litigation continues. For the reasons set forth below, Petitioners' Motion for Preliminary Injunction is **GRANTED IN PART** and **DENIED IN PART**.

**I.    FACTUAL BACKGROUND**

    **A.    COVID-19**

The petition comes against the backdrop of a global pandemic of an infection so widely known at this point that it requires little explanation. COVID-19 has ravaged the nation and the world at whirlwind speed, and the infection, hospitalization, and death counts are changing so quickly that they are outdated as soon as they are published. Regardless, numbers are one of the best ways to describe the real danger that Petitioners fear. As of this writing, the United States

has over 1.4 million COVID-19 cases and at least 84,938 deaths. The New York Times, *Coronavirus in the U.S.: Latest Map and Case Count* (May 14, 2020, 3:03 PM), https://www.ny times.com/interactive/2020/us/coronavirus-us-cases.html. Ohio has seen at least 26,357 infected, while at least 4,718 have been hospitalized and 1,534 have died. https://coronavirus.ohio.gov/ wps/portal/gov/covid-19/home (May 14, 2020, 2:00 PM). Even as the country re-opens, and death and infection rates appear to be slowing, there remains no vaccine or cure and no way to know when the pandemic will end.

While there is much that remains unknown about the virus, we know that some individuals are more susceptible to infection than others, including individuals housed in close quarters, like those in jails and prisons. *See* https://www.cdc.gov/coronavirus/2019-ncov/commu nity/correction-detention/guidance-correctional-detention.html (last visited May 13, 2020). In fact, transmission of COVID-19 has been found to be approximately nineteen times more likely in confined environments. (Judd Walson Decl. ¶ 4, ECF No. 15-2 ("Walson Decl. 1").) One reason for this is that those living in close proximity have greater difficulty maintaining general hygiene or socially distancing. (Meghan Novisky Decl. ¶¶ 4, 10–11, ECF No. 15-1.) And it is difficult for prisoners to follow recommended sanitation procedures. (*Id.* ¶ 13.) High levels of stress exposure, as may be the case in a jail environment, can also weaken the immune system, thereby leaving an individual more susceptible to infection and inhibiting an individual's ability to recover. (*Id.* ¶ 5.)

We also know that some individuals are at risk of more severe consequences from infection than others, including those with particular health conditions. *See* https://www.cdc.gov/ coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited May 13, 2020). Individuals with moderate to severe asthma; some types of heart conditions; hypertension;

chronic liver disease; chronic lung diseases, such as chronic obstructive pulmonary disease ("COPD"); diabetes; and those with compromised immune systems are particularly vulnerable. *Id.*; https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients. html (last visited May 13, 2020); (*see* Walson Decl. 1 ¶ 6(c)). Individuals with these comorbidities are at even greater risk if their comorbidities are not attended to, such as if a diabetic patient's blood sugar levels are not well-controlled. (Judd Walson Decl. ¶ 5(a), ECF No. 38-23 ("Walson Decl. 2").) Severely obese individuals and those who are aged sixty-five years and older are also at higher risk for severe illness or death. https://www.cdc.gov/coronavirus/ 2019-ncov/need-extra-precautions/groups-at-higher-risk.html. ICE also recognizes that those who are elderly, severely obese, or immunocompromised, and those who have particular comorbidities are in the "high-risk" category. (ECF No. 2-5, at 6–7.)

Petitioners' medical and public health expert, Dr. Walson, has opined that the "safest approach for people who have already tested positive for COVID-19 is to discharge them rather than keep them in detention." (Walson Decl. 1 ¶ 15.) Although, for infected individuals who remain detained, Dr. Walson highlights three things that must be in place to ensure their safety. First, because individuals with COVID-19 can dramatically take a turn for the worse, particularly those at highest risk, they must be monitored around the clock by a health care professional or have the ability to self-monitor. (Walson Decl. 2 ¶ 7.) Second, infected individuals must be able to manage their symptoms, manage any comorbidities, and maintain hydration. (*Id.* ¶ 8.) Third, there must exist the ability to quickly escalate care. (*Id.* ¶ 9.) If an infected individual's symptoms worsen, such as shortness of breath, an immediate assessment by a medical professional is necessary, especially if the patient is a high-risk one. (*Id.*) Someone exhibiting severe symptoms should have access to an ambulance within less than thirty minutes. (*Id.* ¶ 14.)

3

Infections in a jail setting are also concerning not just because of the health of the

detainees but because of the constant cycling of people in and out of the facility. Jail staff in

particular can "act as vectors for . . . disease" since they go in and out of the facility each day and

can carry infections between the jail and the broader community. (Novisky Decl. ¶ 15.) The

likelihood of this is increased by virtue of the fact that jail personnel must necessarily be in close

contact with detainees as a part of their jobs. (*Id.* ¶ 14.)

### B.     The Petitioners

Petitioners fall into two primary groups—the infected and the uninfected. Three

petitioners (the "Original Petitioners") are not known to have been infected with COVID-19 and

have not exhibited any symptoms of the virus. (Prelim. Injunction Hr'g Tr. 105:14–17 (May 11,

2020) ("PI Hr'g Tr.").) The Original Petitioners have been temporarily released from ICE

custody and are seeking an extension of this release status. The remaining twenty petitioners (the

"Additional Petitioners"), with two exceptions[1], are currently detained at the Morrow County

Correctional Facility ("Morrow") and are either confirmed to be infected with COVID-19 or are

presumed to be infected. (PI Hr'g Tr. 107:18–118:4.) The Additional Petitioners seek to be

released from Morrow in order to convalesce outside of confinement, or at least under less dire

conditions. Each petitioner's circumstances are different, and because the habeas inquiry is an

individualized one, individual circumstances matter a great deal. In particular, the Court finds

Petitioners' medical histories, current medical conditions, COVID-19 risk factors, and

immigration statuses to be particularly relevant. The Court does not consider Petitioners'

criminal histories to be particularly relevant and does not detail them. Petitioners are or were in

---

[1] One of the Additional Petitioners, Majdi Rabee, was detained at Morrow until May 8, 2020, when he was released on an Order of Supervision. A second of the Additional Petitioners, Alexis Ramirez Portillo, was detained at Morrow until May 14, 2020, when he was also released.

civil detention, and there is no evidence that any are particularly dangerous. The Court gives little weight to conduct for which Petitioners have already served their sentences or have been released from criminal custody.

### 1. Mory Keita

Original Petitioner Mory Keita was detained at Morrow until this Court ordered his temporary release on April 27, 2020. (Mory Keita Decl. ¶ 5, ECF No. 2-4; Eric Porterfield Decl. ¶ 3, ECF No. 28-3.) Mr. Keita was first taken into ICE custody in 2009 and was released on his own recognizance. (Keita Decl. ¶ 5; Porterfield Decl. ¶ 5.) He was later taken into ICE custody again in 2013 and was again released, this time under an Order of Supervision. (Porterfield Decl. ¶ 7.) Mr. Keita says that he has asthma. (Keita Decl. ¶ 6.) However, he has not offered any medical records or other evidence in support. The Court accepts Petitioners' representation that it is exceptionally difficult to gather medical records in the context of the current pandemic. (TRO Prelim. Conf. Hr'g Tr. 12:14–17 (Apr. 27, 2020); PI Hr'g Tr. 106:1–6.) However, the Court expects that Mr. Keita would be able to offer some evidence beyond his own self-serving statements, if something less persuasive than medical records. ICE says that Mr. Keita denied having any medical conditions when he was last taken into ICE custody.[2] (Porterfield Decl. ¶ 10.) Mr. Keita is subject to a final removal order, although ICE has not yet been able to acquire his travel documents. (*Id.* ¶¶ 3, 9.)

---

[2] Respondents say that many of Petitioners did not disclose (or denied) having medical conditions when they were taken into ICE custody. However, Respondents have presented no evidence regarding the questions detainees are asked upon intake or how they are questioned. In fact, Mohamed Abdi testified at the preliminary injunction hearing that he was not asked whether he had asthma when he was transferred to Morrow. (PI Hr'g Tr. 44:18–23.)

### 2. Sidi Njie

Original Petitioner Sidi Njie was detained at Morrow until this Court ordered his temporary release on April 27, 2020. (Julie Yarman Decl. ¶ 15, ECF No. 28-4.) Mr. Njie is recovering from thyroid cancer, and he has not been deemed cancer-free. (Brandy Jatta Decl. ¶ 5, ECF No. 2-1; ECF No. 11-2.) After his cancer diagnosis, Mr. Njie underwent surgery to have his thyroid removed. (Jatta Decl. ¶ 5.) He is still supposed to go to the doctor for regular scans and treatments, although he claims that he was not able to do so in detention. (*Id.*; Nazly Mamedova Decl. ¶¶ 9–10, ECF No. 2-2.) ICE contends that Mr. Njie first requested to have his thyroid checked in October 2019 but later said that he did not need medical attention. (Julie Yarman Decl. ¶ 17(b).) Mr. Njie next requested that his thyroid be examined in April 2020, and he then had blood drawn to test his levels of Thyroid Stimulating Hormone. (*Id.* ¶ 18(c)–(e).) The thyroid cancer has compromised Mr. Njie's immune system, and he has been told that he is more susceptible to infection as a result of his surgery. (Mamedova Decl. ¶ 9.)

Mr. Njie's application for cancellation of removal was denied by an Immigration Judge, but he was granted his request for voluntary departure. (Julie Yarman Decl. ¶ 13.) Mr. Njie is currently appealing the denial of his application before the Board of Immigration Appeals. (*Id.* ¶ 14.)

### 3. Adenis Enrique Prieto Refunjol

Original Petitioner Adenis Enrique Prieto Refunjol was detained at Butler County Jail ("Butler") until this Court ordered his temporary release on April 27, 2020. (Karla Donado Decl. ¶¶ 2, 3, ECF No. 2-3; Richard Tiruchelvam Decl. ¶ 3, ECF No. 28-5 ("Tiruchelvam Decl. 1").) After being detained, Mr. Prieto Refunjol was denied bond by an Immigration Judge. (Tiruchelvam Decl. 1 ¶ 7.) Mr. Prieto Refunjol has been diagnosed with hypertension. (Donado

Decl. ¶ 4; ECF No. 11-1; Tiruchelvam Decl. 1 ¶ 13.) He also claims to have asthma, (Donado Decl. ¶ 4), but has offered no evidence to support this contention. Mr. Refunjol is in active removal proceedings. (Tiruchelvam Decl. 1 ¶¶ 6–10.) However, he is not subject to a final removal order. He is due to have a hearing on his application for relief from removal, but that hearing has yet to be scheduled. (*Id.* ¶¶ 8–10.)

### 4. Mohamed Abdi

Additional Petitioner Mohamed Abdi is currently detained at Morrow. (Mohamed Abdi Decl. ¶ 2, ECF No. 38-15.) Mr. Abdi tested positive for COVID-19 on April 30, 2020, and was symptomatic in early May. (*Id.* ¶¶ 7, 9–10; Vu Nguyen Decl. ¶ 12, ECF No. 36-5.) His symptoms have included trouble breathing, diarrhea, vomiting, bloodshot eyes, body aches, and fever, some of which persist. (Abdi Decl. ¶ 10; PI Hr'g Tr. 30:17–31:10.) Mr. Abdi also lost his sense of taste and smell. (Abdi Decl. ¶ 9.) ICE reports that Mr. Abdi told jail officials on May 8, 2020, that he was experiencing no symptoms and was feeling "fine." (Nguyen Decl. ¶ 16.) Mr. Abdi disputes this. (PI Hr'g Tr. 43:9–12)

Mr. Abdi has asthma and has been prescribed to use an inhaler. (Abdi Decl. ¶ 5; ECF Nos. 21-1, 21-2; PI Hr'g Tr. 28:17–23.) Respondents contend that Mr. Abdi did not report to jail officials upon intake at either Butler or Morrow that he suffered from asthma or needed an inhaler. (Nguyen Decl., ¶¶ 10, 11.) Mr. Abdi insists that he told jail officials during intake at least once that he had asthma, and at other times he was never asked whether he had asthma. (PI Hr'g Tr. 43:25–44:23.) He has not been given an inhaler while detained at Morrow. (Abdi Decl. ¶ 5; PI Hr'g Tr. 28:24–25.) He is also fasting for Ramadan. (Abdi Decl. ¶ 9.) Mr. Abdi is subject to a final removal order. (Nguyen Decl. ¶ 3.)

### 5. Eduardo Alicandro-Marquez

Additional Petitioner Eduardo Alicandro-Marquez tested positive for COVID-19 on April 30, 2020, and he has experienced symptoms of COVID-19. (Eduardo Alicandro-Marquez Decl. ¶¶ 10, 13, ECF No. 38-6; Joseph Simo Decl. ¶ 7, ECF No. 36-20.) As of May 8, 2020, his only reported symptom was a headache. (Simo Decl. ¶ 7(f).) Mr. Alicandro-Marquez does not claim to have any medical conditions that might render him more susceptible to a more severe illness. Mr. Alicandro-Marquez is subject to a final removal order. (*Id.* ¶ 5.)

### 6. Dave Alvarenga Vasquez

Additional Petitioner Dave Alvarenga Vasquez tested positive for COVID-19 on April 30, 2020, and as of May 6, 2020, he was symptomatic, although it is unclear whether he continues to experience symptoms. (Dave Alvarenga Vasquez Decl. ¶¶ 8–10, ECF No. 38-5; Richard Tiruchelvam Decl. ¶ 12, ECF No. 36-21 ("Tiruchelvam Decl. 2").) Mr. Alvarenga Vasquez is diabetic. (Alvarenga Vasquez Decl. ¶ 7; ECF No. 39-1, at 3–19; Tiruchelvam Decl. 2 ¶¶ 10, 12.) He says that while detained at Morrow, he has been denied access to insulin and that his blood sugar has not been consistently checked. (Alvarenga Vasquez Decl. ¶ 7.) ICE offers no information to the contrary. (*See* Tiruchelvam Decl. 2 ¶¶ 10, 12.) Mr. Alvarenga Vasquez is subject to a final removal order. (*Id.* ¶ 7.)

### 7. Antonio Aparicio Luna

Additional Petitioner Antonio Aparicio Luna tested positive for COVID-19 on April 30, 2020, and as of May 8, 2020, he was experiencing some symptoms. (Antonio Aparicio Luna Decl. ¶¶ 4, 6, ECF No. 15-5; Nicholas Whitman Decl. ¶¶ 14, 16, ECF No. 36-13.) Mr. Aparicio Luna contends that he has a history of high blood pressure and kidney stones. (Aparicio Luna Decl. ¶ 4.) He has offered no medical records in support. However, ICE confirms the high blood

pressure diagnosis. (Whitman Decl. ¶ 13.) Mr. Aparicio Luna has unlawfully entered the United States, and been deported, on three prior occasions, and he is awaiting the fourth reinstatement of his original removal order. (*Id.* ¶¶ 8–9.)

### 8.    **Ranoldo Balfour**

Additional Petitioner Ranoldo Balfour tested positive for COVID-19 on May 2, 2020, and as of May 8, 2020, he was symptomatic. (Ranoldo Balfour Decl. ¶ 7, ECF No. 38-18; Bryan Meyer Decl. ¶ 13, ECF No. 36-19.) Mr. Balfour claims to have had a long history of breathing issues and that he has historically used an inhaler. (Balfour Decl. ¶ 6.) However, he has been denied use of an inhaler while detained at Morrow and has been denied access to a doctor regarding his breathing problems. (*Id.*) Mr. Balfour reports that he has had three recent breathing attacks but was given no medication or an inhaler and was given no medical attention on two of these three occasions. (*Id.* ¶ 8.) ICE contends that Mr. Balfour did not report any health problems when he was taken into custody. (Meyer Decl. ¶ 13(a).) ICE offers no information disputing Mr. Balfour's reports of breathing attacks. (*See id.*) Mr. Balfour has been granted voluntary departure and remains in custody as he arranges his travel. (*Id.* ¶ 11.)

### 9.    **Jermaine Bell**

Additional Petitioner Jermaine Bell tested positive for COVID-19 on April 30, 2020, and as of May 4, 2020, he was symptomatic. (Jermaine Bell Decl. ¶ 13, ECF No. 38-8; Oscar Blair Decl. ¶ 10, ECF No. 36-23.) For approximately ten days, he had sinus congestion, a sore throat, shortness of breath, and chest pains. (Bell Decl. ¶ 9.) According to ICE, Mr. Bell has never requested to see medical staff while in custody. (Blair Decl. ¶ 10.) Mr. Bell reports no medical

condition that might render him more susceptible to a more severe illness.[3] He is currently appealing the denial of his asylum claim. (Bell Decl. ¶ 6; Blair Decl. ¶ 3.)

### 10. Jesus Manuel Chavez Rodriguez

Additional Petitioner Jesus Manuel Chavez Rodriguez[4] tested positive for COVID-19 on April 30, 2020. (Liliana Vasquez Decl. ¶ 12, ECF No. 38-9; Timothy Hinman Decl. ¶ 11, ECF No. 36-4.) On May 1, he began experiencing some pain in his lungs, which made it hard to breathe. (Vasquez Decl. ¶ 14.) He then lost his sense of taste and smell, started experiencing diarrhea and nausea, and felt pain in his bones. (*Id.*) As of May 9, he reported severe headaches, sweating, and swollen sinuses that make it hard to breathe. (*Id.*) ICE attests that Mr. Chavez Rodriguez has complained of headaches but has neither displayed nor reported any other symptoms. (Hinman Decl. ¶ 13.) Mr. Chavez Rodriguez has Chronic Hepatitis C and had testicular cancer over a decade ago. (Vasquez Decl. ¶ 7; ECF No. 21-7.) ICE contends that he denied having Hepatitis C when he was initially assessed at Morrow and never disclosed a history of cancer. (Hinman Decl. ¶ 10.) Mr. Chavez Rodriguez does not speak English. (Vasquez Decl. ¶ 14.)

His attorney is currently applying for cancellation of removal. (*Id.* ¶ 5.) Mr. Chavez Rodriguez is immediately removable if ICE can obtain his travel documents, although ICE first tried to get these documents in 2009 and was unsuccessful. (*Id.* ¶ 11.) Otherwise, Mr. Chavez Rodriguez will be able to seek bond and continue to try to remain in the United States. (*Id.*)

---

[3] The Amended Petition says that Mr. Bell "suffers complications from ten simultaneous gunshot wounds he suffered in 2004." (Amended Pet. ¶ 38, ECF No. 14.) This is not in either of Mr. Bell's Declarations, and the Court has not been provided with any evidence in support of this claim.

[4] Mr. Chavez Rodriguez is detained under the name Jesus Manuel Martinez Roman.

### 11. Juan Antonio Contreras Moran

Additional Petitioner Juan Antonio Contreras Moran tested positive for COVID-19 in April 2020 and was the first inmate to be moved to the isolation pod after registering a temperature of 101 degrees. (Juan Antonio Contreras Moran Decl. ¶¶ 7, 8, ECF No. 38-13; Piotr Swierk Decl. ¶ 15, ECF No. 36-11.) He reports experiencing bad headaches, shortness of breath, pain in his bones, dizziness, and a bad fever. (Contreras Moran Decl. ¶ 7.) However, as of May 9, 2020, he was starting to feel better but still could not taste or smell. (*Id.*)

Mr. Contreras Moran says that he was shot in the chest in December 2019. (Contreras Moran Decl. ¶ 5; ECF No. 21-9.) The bullet punctured an artery in his heart. (Contreras Moran Decl. ¶ 5.) According to Mr. Contreras Moran this led to partial paralysis in his left arm. (*Id.* ¶ 6.) He also is weaker due to his heart damage. (*Id.*) ICE claims he reported no medical issues when he was admitted to Morrow on April 8. (Swierk Decl. ¶ 15.)

In July 2019, Mr. Contreras Moran was ordered removed in absentia. (*Id.* ¶ 11.) On September 11, 2019, Mr. Contreras Moran's application for Deferred Action for Childhood Arrivals was denied. (*Id.* ¶ 12.)

### 12. Osman Faghi Haji

Additional Petitioner Osman Faghi Haji tested positive for COVID-19 on April 30, 2020. (Osman Faghi Haji Decl. ¶ 9, ECF No. 38-17; Amanda Elliott Decl. ¶ 12, ECF No. 36-16.) Soon after, he began experiencing headaches and a fever, as well as trouble breathing. (Faghi Haji Decl. ¶ 12.) He has started feeling better but is not fully recovered. (*Id.*) According to ICE, Mr. Faghi Haji has not reported any symptoms since May 5. (Elliott Decl. ¶ 13.) Mr. Faghi Haji claims that he had childhood asthma but that it mostly subsided in adulthood. (Faghi Haji Decl.

¶ 12.) ICE claims that he did not report any medical conditions upon intake at Morrow. (Elliott Decl. ¶ 11.) Mr. Faghi Haji is subject to a final removal order. (*Id.* ¶ 9.)

### 13.   Salvador Garcia

Additional Petitioner Salvador Garcia[5] began experiencing headaches, chills, fever, and body aches on April 27, 2020. (Salvador Garcia Decl. ¶ 7, ECF No. 38-19; Donald Haverty Decl. ¶ 14, ECF No. 36-18.) His temperature was consistently above 100 degrees Fahrenheit for four days thereafter. (Garcia Decl. ¶ 8.) On April 30, he tested positive for COVID-19. (*Id.*; Haverty Decl. ¶ 15.) As of May 10, he was still experiencing headaches, coughing, fatigue, body aches, and difficulty breathing. (Garcia Decl. ¶ 10.) Mr. Garcia was diagnosed with tuberculosis in January 2020 and was prescribed a course of medication that he was supposed to take for nine months. (*Id.* ¶¶ 19–21; ECF No. 39-1, at 20.) He claims that he has not been receiving this medication while detained at Morrow. (Garcia Decl. ¶¶ 19–20.) ICE contends that a chest X-ray of Mr. Garcia was taken at Morrow, which was negative for active tuberculosis. (Haverty Decl. ¶¶ 11–13.) Mr. Garcia also states that he had surgery to remove hemorrhoids in October 2019 but still experiences bleeding. (Garcia Decl. ¶ 21.) According to ICE, Mr. Garcia did not disclose any health issues at his initial screening at Morrow. (Haverty Decl. ¶ 10.)

Mr. Garcia is awaiting transfer to the custody of the United States Marshal Service for criminal prosecution for illegal reentry. (*Id.* ¶ 3.) However, he also has expressed a fear of being returned to Mexico, and his claim is being referred to the asylum office for evaluation. (*Id.* ¶ 7.)

### 14.   Jose Misael Navarro

Additional Petitioner Jose Misael Navarro tested positive for COVID-19 on April 30, 2020. (Jose Misael Navarro Decl. ¶ 11, ECF No. 38-12; Scott Yarman Decl. ¶ 12, ECF No. 36-

---

[5] Mr. Garcia is detained under the name Ramon Garcia.

7.) Mr. Misael Navarro reports experiencing chest pains, numbness in his left arm and hand, fatigue, trouble breathing, loss of taste and smell, congestion, body aches, headaches, difficulty swallowing, and diarrhea. (Misael Navarro Decl. ¶ 12). Mr. Misael Navarro says that he recently suffered a bout of shingles. (*Id.* ¶ 7.) He also suffers from traumatic brain injury for which he must receive regular scans. (*Id.* ¶¶ 5–6.) He has not been having brain scans while in ICE custody. (*Id.* ¶ 6.) He is also blind in one eye and does not have glasses. (*Id.* ¶ 5.) He touches surfaces with his hands to get around. (*Id.*) The bright lights in the isolation pod have worsened his vertigo and dizziness caused by his loss of eyesight. (*Id.* ¶ 12.) ICE contends that Mr. Misael Navarro denied having a history of head trauma, vision issues, or treatment for headaches upon intake at Morrow. (Scott Yarman Decl. ¶ 14.) Mr. Misael Navarro is currently appealing an Immigration Judge's decision denying his request for withholding of removal. (*Id.* ¶¶ 8–9.)

### 15. Abdiaziz Mohamud

Additional Petitioner Abdiaziz Mohamud tested positive for COVID-19 on April 30, 2020. (Abdiaziz Mohamud Decl. ¶ 6, ECF No. 38-1; Ronnie Winters Decl. ¶ 18, ECF No. 36-6.) Thereafter, he began experiencing terrible headaches, shortness of breath, and body aches. (Mohamud Decl. ¶ 11.) Mr. Mohamud contends that he is at higher risk for a more severe illness because he is obese. (*Id.*) He also states that he has a history of breathing problems that have required the use of inhalers and nebulizer treatments. (*Id.* ¶ 13.) He claims that on May 8 he asked for an inhaler and was denied due to his lack of medical documentation of asthma. (*Id.*) ICE contends that Mr. Mohamud did not report any medical issues upon intake at Morrow. (Winters Decl. ¶ 15.) Mr. Mohamud is subject to a final removal order. (*Id.* ¶ 3.)

### 16.    Alberto Perez Arreaga

Additional Petitioner Alberto Perez Arreaga tested positive for COVID-19 on April 30, 2020. (William Belanich Decl. ¶ 19, ECF No. 36-22.) On May 5, he began experiencing fever, sore throat, and body aches. (Zachary Sanders Decl. ¶ 13, ECF No. 15-23.) He began to suffer severe headaches and, on May 7, developed a dry cough, and those symptoms persisted through May 10. (Ener Perez Decl. ¶¶ 3–4, ECF No. 38-2.) He is sixty-six years old and has a liver condition. (Sanders Decl. ¶ 15.) According to ICE, Mr. Perez Arreaga denied experiencing any coronavirus symptoms as of May 9. (Belanich Decl. ¶ 20.) Mr. Perez Arreaga is in custody on a reinstated removal order pending removal. (*Id.* ¶ 3.) He has previously been released from ICE custody. (*Id.* ¶ 10.) He is pursuing a claim for asylum, and his attorney reports that his removal proceedings have been "terminated." (Sanders Decl. ¶¶ 6–7.)

### 17.    Neptune Pierre

Additional Petitioner Neptune Pierre tested positive for COVID-19 on April 30, 2020. (Neptune Pierre Decl. ¶ 7, ECF No. 38-16; Ryan Tincher Decl. ¶ 11, ECF No. 36-8.) ICE claims that Mr. Pierre has reported no symptoms as of May 8. (Tincher Decl. ¶ 12.) Mr. Pierre has high blood pressure, and he also says that he has a history of heart problems. (Pierre Decl. ¶ 8; Tincher Decl. ¶ 13; ECF No. 39-1, at 21.) Mr. Pierre is currently appealing his removal order. (Tincher Decl. ¶ 10.)

### 18.    Kevin Rivera Rodriguez

Additional Petitioner Kevin Rivera Rodriguez tested positive for COVID-19 on April 30, 2020. (Kevin Rivera Rodriguez Decl. ¶ 8, ECF No. 38-14; Suha Peng Decl. ¶ 12, ECF No. 36-14.) On May 3, Mr. Rivera Rodriguez began experiencing body aches, fever, diarrhea, and difficulty breathing. (Rivera Rodriguez Decl. ¶ 9.) Mr. Rivera Rodriguez reported to jail officials

that he was experiencing shortness of breath on May 6. (Peng Decl. ¶ 14.) On May 9, he began

feeling better but still suffered from diarrhea, headaches, and some shortness of breath. (Rivera

Rodriguez Decl. ¶ 9.) However, ICE claims that by May 8, Mr. Rivera Rodriguez reported no

symptoms and stated that he was feeling fine. (Peng Decl. ¶ 14.) Mr. Rivera Rodriguez does not

report any medical condition that might render him more susceptible to a more severe illness. He

is subject to a final removal order. (*Id.* ¶ 4.)

### 19.  Jorge Salas-Marin

Additional Petitioner Jorge Salas-Marin tested positive for COVID-19 on May 1, 2020.

(Jorge Salas-Marin, Decl. ¶ 7, ECF No. 38-10; Joseph Ottjepka Decl. ¶ 11, ECF No. 36-10.) His

symptoms started with a bad headache and cough and progressed to a sore throat, high fever,

trouble breathing and dizziness. (Salas-Marin Decl. ¶ 7.) Mr. Salas-Marin was diagnosed with

Chronic Obstructive Pulmonary Disease ("COPD") in February 2019. (ECF Nos. 21-5, 21-6.) He

was prescribed an inhaler and was told by his doctor to follow a prescribed regimen and not to

suspend treatment. (*Id.*) ICE claims that Mr. Salas-Marin has not reported any medical problems.

(Ottjepka Decl. ¶ 11.) Mr. Salas-Marin is currently in removal proceedings. (*Id.* ¶ 3.)

### 20.  Fabian Santiago Silva

Additional Petitioner Fabian Santiago Silva was presumed to be positive for COVID-19

as of April 30, 2020. (Fabian Santiago Silva Decl. ¶ 8, ECF No. 15-8; Stephanie Parker Decl.

¶ 12, ECF No. 36-15.) On May 6, 2020, Mr. Santiago Silva reported shortness of breath. (ECF

No. 39-2, at 3.) He says that he is pre-diabetic. (Santiago Silva Decl. ¶ 5.) ICE claims that Mr.

Santiago Silva has been asymptomatic. (Parker Decl. ¶ 14.) He has been ordered removed but

has been granted voluntary departure (*Id.* ¶ 10.) However, ICE says that he "will not depart the

United States until the quarantine is lifted, on or after May 15, 2020." (*Id.* ¶ 13.)

### 21.    Jose Luis Vergara Patino

Additional Petitioner Jose Luis Vergara Patino began to experience chills, weakness, fever, and loss of taste and smell on April 25, 2020. (Jose Luis Vergara Patino Decl. ¶ 11, ECF No. 38-11.) He tested positive for COVID-19 on April 30, 2020. (*Id.* ¶ 12; Andrew Wend Decl. ¶ 11, ECF No. 36-17.) By May 11, most of his symptoms had improved. (Vergara Patino Decl. ¶ 11.) Mr. Vergara Patino says that he had asthma and lung damage due to tuberculosis as a child. (*Id.* ¶ 14.) He reports being hospitalized several times in Mexico and once in the United States in 2012 for tuberculosis treatment. (*Id.*) His medical records show that his lungs are abnormal. (ECF No. 21-8.) Mr. Vergara Patino says that he voiced his concerns about his lung conditions to jail staff at Morrow and to his ICE agent. (Vergara Patino Decl. ¶ 14.) ICE claims that Mr. Vergara Patino denied having tested positive for tuberculosis and having asthma upon intake at Morrow. (Wend Decl. ¶ 9.) Mr. Vergara Patino has been ordered removed from the United States and has waived his appeal. (*Id.* ¶ 7.)

### 22.    Majdi Rabee

Additional Petitioner Majdi Rabee tested positive for COVID-19 in April 2020 while detained at Morrow. (Majdi Rabee Decl. ¶ 5, ECF No. 15-15.) It appears that he was previously symptomatic but that as of May 4, 2020, he is feeling better. (*Id.* ¶ 6.) Mr. Rabee claims that he has asthma. (*Id.* ¶ 4.) He also has been fasting for Ramadan. (*Id.* ¶ 6.) Mr. Rabee has been the subject of an active removal order for over a year. (*Id.* ¶ 3.)

On May 8, 2020, Mr. Rabee was released from Morrow, and he is now subject to an Order of Supervision. (ECF No. 36-12.) At the preliminary injunction hearing, counsel for Respondents did not know why Mr. Rabee had been released. (PI Hr'g Tr. 16:15–20.)

### 23.    Alexis Ramirez Portillo

Additional Petitioner Alexis Ramirez Portillo tested positive for COVID-19 in late April 2020. (Alexis Ramirez Portillo Decl. ¶ 6, ECF No. 38-3; Kenneth Williams Decl. ¶ 9, ECF No. 36-9.) Mr. Ramirez Portillo reports that as of May 11, he had a headache, fever, body aches, and diarrhea for more than a week. (Ramirez Portillo Decl. ¶ 9.) He has also begun to suffer from chest pain and difficulty breathing. (*Id*.) Mr. Ramirez Portillo contends that he has had breathing problems throughout his life, and his doctor advises that she has previously treated him for acute chronic bronchitis on more than one occasion from 2014 until January 2016. (*Id.* ¶ 4; ECF Nos. 21-3, 21-4.) She also says that Mr. Ramirez Portillo should be protecting himself against exposure to the virus. (ECF Nos. 21-3, 21-4.) ICE claims that Mr. Ramirez Portillo has not reported any medical problems. (Williams Decl. ¶ 11.) Mr. Ramirez Portillo is subject to an "administratively final removal order" and was originally granted voluntary departure, although he has a pending motion to open his removal proceedings (*Id.* ¶¶ 3, 7–8.) His attorney is in the process of requesting a new asylum hearing. (Ramirez Portillo Decl. ¶ 3.)

On May 14, 2020, Respondents informed the Court that Mr. Ramirez Portillo had been released from civil detention.

### C.    The County Jails

ICE partners with state and local law enforcement to house ICE detainees. (*See* Christopher LaBier Decl. ¶ 4, ECF No. 36-24 ("LaBier Butler Decl.").) Butler and Morrow are two such partner facilities. (*Id.*; Christopher LaBier Decl. ¶ 3, ECF No. 36-25 ("LaBier Morrow Decl.").) The conditions at Morrow are most relevant to these proceedings because it is the current place of detention for all but one of the Additional Petitioners. Butler's conditions are

relevant because should the Court order that any of the Original Petitioners be re-detained, Respondents represent that they would be sent to Butler. (PI Hr'g Tr. 124:8–11.)

The only information that Respondents have provided the Court about the conditions at Butler and at Morrow comes from Christopher LaBier, a United States Department of Homeland Security manager who supervises ICE's detention facilities in southern Ohio. (LaBier Butler Decl. ¶ 1; LaBier Morrow Decl. ¶ 1.) There is no evidence that Mr. LaBier has visited Butler or Morrow since the beginning of this pandemic or that he has any firsthand knowledge of the conditions of either facility. Respondents have not provided the Court with testimony from any Butler or Morrow employees or any other individuals who have personally witnessed the current on-the-ground conditions of either facility.

### 1.      Butler County Jail

Butler has a capacity of 848 and, as of May 6, 2020, houses 666 inmates, including seventy ICE detainees. (LaBier Butler Decl. ¶ 16.) This exceeds ICE's recommendation to reduce populations at all facilities housing ICE detainees to approximately seventy-five percent capacity. (ECF No. 2-5, at 13.) However, most ICE detainees are housed in PODs, which are at lower capacity. (LaBier Butler Decl. ¶ 21.) The capacity of each POD housing ICE detainees is not known. Jail PODs have separate cells, with each POD sharing a common dayroom and common bathroom/shower facilities. (*Id.* ¶ 22.) Cells are double occupancy. (*Id.* ¶¶ 21–22.)

Butler staff conduct medical screenings for new detainees to assess individuals for fever and respiratory illness. (*Id.* ¶ 12.) Symptomatic detainees are isolated in single cells and tested for COVID-19, and a positive test triggers further isolation and treatment in PODs specifically designated for quarantine and medical observation. (*Id.* ¶¶ 13–14) Butler has a dedicated POD, capable of housing sixteen inmates, for purposes of quarantine, and additional PODs can be

cleared for quarantine if necessary. (*Id.* ¶ 21.) Detainees who are infected upon intake are "referred to a local hospital" in the case of "clinical deterioration." (*Id.* ¶ 13.)

New detainees are also asked to confirm whether, in the prior two weeks, they have had close contact with any individuals "with laboratory-confirmed COVID-19" or have traveled "from or through area(s) with sustained community transmission." (*Id.* ¶ 12.) Based on this initial screening, Butler staff decide whether to monitor or isolate each new detainee. (*Id.* ¶ 13.) Asymptomatic detainees who have previously been exposed to a person with confirmed COVID-19 are housed in single cells and are placed in quarantine until fourteen days have passed since the potential exposure. (*Id.* ¶ 14.) New detainees who are asymptomatic and have not been exposed to the virus are housed in a cell with another new detainee for fourteen days before being released into the general population. (*Id.*)

While Butler has taken steps to reduce its headcount and to isolate new transfers, it appears that detainees are still confined to shared cells. (*See* Donado Decl. ¶ 3(a).) And there are individuals in the jail's general population with flu-like symptoms. (*See id.* ¶ 3(b).)

In order to implement social distancing measures, only twelve cells or less are engaged in recreation at a time, and meals are served in detainees' cells. (LaBier Butler Decl. ¶ 20.) Butler has suspended non-legal visitations and screens all those entering the secure area of the jail, including taking body temperatures with a thermal imaging machine. (*Id.* ¶¶ 17–18.)

Butler has an onsite medical infirmary and access to specialty services and hospital care through outside vendors. (*Id.* ¶ 15.) Emergency medical assistance may be requested from the corrections officer on duty. (*Id.*)

PODs, individual cells, and common areas and phones are disinfected nine times per day. (*Id.* ¶ 23.) Detainees who volunteer to clean the PODs are provided with gloves, surgical masks,

and eye protection. (*Id.*) Detainees are provided twenty-four-hour access to water, personal soap and hygiene items, and cleaning products and disinfectants to clean their cells. (*Id.*) They can also request surgical masks and gloves. (*Id.*) Staff are provided with N-95 masks, gowns, Tyvek suits, gloves, hand sanitizer, disinfectants, soap, and water. (*Id.*) Detainees are issued clean clothing, towels, and sheets twice per week, and may have certain personal clothing laundered daily. (*Id.* ¶ 24.)

As of May 6, 2020, at 10:30 AM, no ICE detainees are suspected to have COVID-19. (*Id.* ¶ 25.) Two inmates have tested positive and have been quarantined at another facility. (*Id.* ¶ 25(a).) Eight inmates and four ICE detainees are quarantined due to the presence of a COVID-19 symptom or due to the results of their intake screening. (*Id.* ¶ 25(b).)

This infection information is of limited utility given that it is a week old, and infection rates are constantly changing. Moreover, Respondents have offered no evidence as to the frequency of testing occurring at Butler. In fact, it appears unlikely that many detainees have been tested because Butler is only testing individuals who exhibit symptoms. (*Id.* ¶¶ 12–13.) Respondents contend that Butler is no longer accepting new detainees or inmates, although the reason why is not clear. (PI Hr'g Tr. 124:15–22.)

## 2. Morrow County Jail

Morrow has a maximum capacity of 126 and currently houses approximately seventy-seven people[6], including forty-nine ICE detainees, most of whom are housed in two dormitories. (LaBier Morrow Decl. ¶¶ 11–12.) The large dormitory has a maximum capacity of sixty-five

---

[6] Mr. LaBier's May 6, 2020, declaration says seventy-nine people but at least two, Mr. Rabee and Mr. Ramirez Portillo, have since been released.

people. (*Id.* ¶ 11.) As of May 8, 2020, ICE reports that it houses thirty-three individuals[7], but it is unclear how many of these individuals are ICE detainees. (Elliott Decl. ¶ 14; Wend Decl. ¶ 13.) The small dormitory has a maximum capacity of thirty-five and currently houses sixteen ICE detainees. (LaBier Morrow Decl. ¶¶ 11–12.) As of April 24, 2020, Morrow stopped accepting new detainees.

The dormitories each consist of one open room. (*Id.* ¶ 13.) The rooms have windows that do not open, so there is no fresh air. (Abdi Decl. ¶ 6(c); Mohamud Decl. ¶ 9; Rivera Rodriguez Decl. ¶ 7; PI Hr'g Tr. 24:15–18.) A portion of the room is lined with beds spaced two feet apart. (LaBier Morrow Decl. ¶ 13.) Mr. LaBier claims that each detainee sleeps next to an empty bed on either side. (*Id.*) Morrow's detainees dispute this. (Alicandro-Marquez Decl. ¶ 14; Balfour Decl. ¶ 10; Garcia Decl. ¶ 14; Keita Decl. ¶ 7; PI Hr'g Tr. 23:5–23, 53:6–13.) In addition, detainees still sleep with occupied beds in front of and behind them. (Garcia Decl. ¶ 14; PI Hr'g Tr. 23:5–23, 53:6–13, 67:9–16.) Detainees are not allowed to change what bed they sleep in. (Vasquez Decl. ¶ 14; PI Hr'g Tr. 45:21–46:1.)

Each dormitory also has a common bathroom and shower area. (LaBier Morrow Decl. ¶ 13.) The dormitories share a common cafeteria. (*Id.*) Mr. LaBier contends that mealtimes are currently staggered into small groups of eight to allow for social distancing. (*Id.*) Multiple Morrow detainees dispute this. (Alicandro-Marquez Decl. ¶ 15; Bell Decl. ¶ 8; Garcia Decl. ¶ 17; Keita Decl. ¶ 7; Mamedova Decl. ¶ 8(d); Navarro Gonzalez Decl. ¶ 9; Pierre Decl. ¶ 6; Vergara Patino Decl. ¶ 10.)

Morrow's medical office is staffed Monday through Friday by a Registered Nurse from 6:00 AM to 2:00 PM and a Licensed Practical Nurse 2:00 PM to 10:00 PM. (LaBier Morrow

---

[7] As of May 6, 2020, the large dormitory was reported to be housing thirty-seven individuals. (LaBier Morrow Decl. ¶ 12.) Respondents do not explain this discrepancy or where the four remaining individuals now are.

Decl. ¶ 15.) There is always a nurse on call on nights and weekends. (*Id.*) Morrow also has a telehealth system that can be used to consult with outside doctors. (*Id.*) Respondents have not, however, offered any evidence that this system has been used during the current pandemic. Access to hospital care is also theoretically available. (*Id.*)

Morrow has prohibited all non-legal visits and screens all staff, contractors, volunteers, and vendors upon entering the facility. (*Id.* ¶¶ 16–17.) Screening involves taking body temperatures, but Respondents have provided no information on any other steps. (*See id.* ¶ 17.)

As of May 6, 2020, at 11:30 AM, forty-seven ICE detainees had tested positive for COVID-19. (*Id.* ¶ 26.) Two other ICE detainees' results were inconclusive, although they remained housed with the positive cases. (*Id.*) Another ICE detainee tested negative but, at the direction of the local health department, was being treated as a positive case. (*Id.*) Additional Petitioners are housed in the two dormitories. (*See id.*) It is unknown whether any further positive tests have occurred at Morrow since May 6.

ICE contends that as of May 6, 2020, no infected detainees had exhibited "severe symptoms" or had required hospitalization. (*Id.* ¶ 27.) Respondents have not provided updated information, and we know that this information is no longer true. At least one detainee was transported to the hospital, (PI Hr'g Tr. 48:4–49:1), and there is a dispute about whether other detainees have exhibited severe enough symptoms to be transported to the hospital, (Balfour Decl. ¶ 8; Contreras Moran Decl. ¶ 10; Perez Decl. ¶ 4; Rivera Rodriguez Decl. ¶ 10; PI Hr'g Tr. 56:15–58:5).

Mr. LaBier contends that Morrow staff check detainees' body temperatures, pulse rates, and blood oxygen levels every eight hours. (LaBier Morrow Decl. ¶ 28.) However, the evidence shows that vitals are checked, at most, twice per day, (Abdi Decl. ¶ 15; Alicandro-Marquez Decl.

22

¶ 11; Bell Decl. ¶ 12; PI Hr'g Tr. 54:13–16, 71:17–19), an amount that Respondents concede is below the minimum recommended by Ohio Department of Health ("ODH") guidelines, (*compare* LaBier Morrow Decl. ¶ 28, *with* PI Hr'g Tr. 111:18–25). Vitals are generally checked by correctional officers who record the information they obtain. (Abdi Decl. ¶ 15; Alicandro-Marquez Decl. ¶ 11; Bell Decl. ¶ 12; Garcia Decl. ¶ 12; Mohamud Decl. ¶ 12; Navarro Gonzalez Decl. ¶ 14; Salas-Marin Decl. ¶ 9; Vasquez Decl.¶ 14; PI Hr'g Tr. 34:22–35:2, 55:4–8, 71:20–72:2.) It is not clear what happens to this information after it is recorded. Respondents contend that an inmate exhibiting a fever will be examined by a nurse. (PI Hr'g Tr. 115:9–17.) Yet they offer no evidence that the collected information is ever provided to a nurse or other medical professional or that the on-site nurses have conducted any examinations. Detainees report that they rarely, if ever, see the nursing staff. (Bell Decl. ¶ 12; Garcia Decl. ¶ 12; Mohamud Decl. ¶ 12; Salas-Marin Decl. ¶ 9; PI Hr'g Tr. 31:22–24, 32:20–33:9, 35:3–5, 55:7–8, 72:1-2.)

ICE has provided the Court with forty snapshots of temperature measurements for the Additional Petitioners. (ECF No. 39-2; Belanich Decl. ¶ 20; Blair Decl. ¶ 12; Elliott Decl. ¶ 13; Haverty Decl. ¶ 16; Hinman Decl. ¶ 14; Meyer Decl. ¶ 13; Nguyen Decl. ¶ 16; Parker Decl. ¶ 14; Peng Decl. ¶ 14; Simo Decl. ¶ 7; Tincher Decl. ¶ 12; Tiruchelvam Decl. 2 ¶ 12; Wend Decl. ¶ 12; Whitman Decl. ¶ 16; Williams Decl. ¶ 10; Winters Decl. ¶ 20; Scott Yarman Decl. ¶ 13.) Not only do none of these temperature readings indicate a fever, none was higher than 98.1 degrees. (*Id.*). Eight were below 96 degrees[8], including one below 95 degrees, (*id.*), which is the clinical benchmark for hypothermia and requires immediate medical attention, *see* https://www.cdc.gov/disasters/winter/staysafe/hypothermia.html (last visited May 13, 2020). Respondents

---

[8] Counsel for Respondents opined at the preliminary injunction hearing that a normal temperature "is somewhere in the neighborhood of . . . 96 to 98" degrees. (PI Hr'g Tr. 113:21–22.) By this definition, eight temperature readings in the last week were abnormal, and yet there is no evidence that Morrow staff or ICE did anything about this.

have no explanation for these low, and seemingly inaccurate, temperature readings, but they might be attributable to ICE's usage of thermometers that expired in 2016. (Garcia Decl. ¶ 13; PI Hr'g Tr. 54:17–23, 74:20–75:1.)

Medical staff are also supposed to ask detainees whether they are experiencing any breathing issues or any additional or worsening symptoms. (LaBier Morrow Decl. ¶ 28.) But the evidence is that when these questions are asked, they are asked by correctional officers, not medical staff, (Alicandro-Marquez Decl. ¶ 11; Vasquez Decl. ¶ 14; PI Hr'g Tr. 34:24–25, 55:17–18), and many times the correctional officers do not even inquire, (Garcia Decl. ¶ 12; Navarro Gonzalez Decl. ¶ 14). Even though multiple detainees, including some of the Petitioners, have difficulty speaking and understanding English, (Alicandro-Marquez Decl., at 4; Donado Decl. ¶ 4; Ramirez Portillo Decl., at 4; Rivera Rodriguez Decl., at 4; Vasquez Decl. ¶ 14; PI Hr'g Tr. 35:9–11, 55:9–12, 72:3–5), there is no evidence that any Morrow staff speak a language other than English or have used any qualified interpreters to facilitate questioning detainees about their symptoms, (PI Hr'g Tr. 35:12–18, 55:13–16, 72:6–11; 125:11–13).

Dwayne Roman testified at the preliminary injunction hearing that this language barrier resulted in a detainee, Eduardo, who was not showing any COVID-19 symptoms being transferred to the isolation pod with infected detainees at a time when the infection was less widespread. (PI Hr'g Tr. 72:14–73:17.) Eduardo subsequently contracted the virus. (*Id.*)

As with the vitals checks, it is also unclear what, if anything, correctional officers, do with these symptom reports. There is evidence that even when detainees report serious symptoms, or appear to be in distress, no action is taken. (Balfour Decl. ¶ 8; Contreras Moran Decl. ¶ 10; Perez Decl. ¶ 4; Rivera Rodriguez Decl. ¶ 10; ECF No. 39-2.)

ODH does not currently recommend any treatment for infected individuals except Tylenol, and ICE claims that Morrow staff provide Tylenol upon request. (LaBier Morrow Decl. ¶ 28.) However, some Additional Petitioners contend that Tylenol is not distributed when requested. (Alicandro-Marquez Decl. ¶ 17 (one pill per day); Alvarenga Vasquez Decl. ¶ 13 (has not been given or offered Tylenol in a week); Garcia Decl. ¶ 11; Salas-Marin Decl. ¶ 9 (once per day); PI Hr'g Tr. 41:22–42:1.)

Mr. LaBier contends that Morrow cleans the dormitories three times per day using a viricidal disinfectant. (LaBier Morrow Decl. ¶ 29.) He does not provide the basis for this belief, and it is not supported by anyone who has recently been inside the facility. Petitioners contend that they are charged with cleaning their dormitories and that they are given minimal equipment to do so. (Alicandro-Marquez Decl. ¶ 8; Alvarenga Vasquez Decl. ¶ 12; Balfour Decl. ¶ 10; Bell Decl. ¶¶ 17–18; Contreras Moran Decl. ¶ 11; Garcia Decl. ¶ 18; Pierre Decl. ¶ 9; Salas-Marin Decl. ¶ 12; Vasquez Decl. ¶ 14; Vergara Patino Decl. ¶ 15; PI Hr'g Tr. 70:2–11.) Rather, the detainees are provided with basic cleaning materials but are rarely, if ever, provided with disinfectants. (Alicandro-Marquez Decl. ¶ 8; Bell Decl. ¶ 18; Contreras Moran Decl. ¶ 11; Garcia Decl. ¶ 18; Pierre Decl. ¶ 9; Salas-Marin Decl. ¶ 12; Vergara Patino Decl. ¶ 15; PI Hr'g Tr. 24:2–14.) In addition, because detainees are responsible for cleaning their own living areas, the areas inhabited by those who are not able or willing to clean remain uncleaned. (Vasquez Decl. ¶ 14.) Shared aspects of the facility, such as the telephones, are not cleaned in-between uses. (Alicandro-Marquez Decl. ¶ 7; Garcia Decl. ¶ 16; Keita Decl. ¶ 7; PI Hr'g Tr. 24:24–25:12.)

Detainees' ability to maintain personal hygiene is also questionable. The bathrooms in both dormitories are filthy. (Alicandro-Marquez Decl. ¶ 8; Bell Decl. ¶ 17; Contreras Moran

Decl. ¶ 11; Vasquez Decl. ¶ 14.) Only one showerhead in the small dormitory is functional and its water pressure is barely a trickle. (Alicandro-Marquez Decl. ¶ 8; Contreras Moran Decl. ¶ 12; PI Hr'g Tr. 54:7–12, 68:23–69:11.) There is a broken toilet leaking in the large dormitory. (Bell Decl. ¶ 17; Vergara Patino Decl. ¶ 16.)

Mr. LaBier states that detainees' clothing, towels, and bedding are laundered twice per week. (LaBier Morrow Decl. ¶ 31.) However, some detainees report less frequent opportunities to change their clothes. (Alicandro-Marquez Decl. ¶ 16 (weekly); Balfour Decl. ¶ 11 (over a week); Bell Decl. ¶ 15 (a week or more); Pierre Decl. ¶ 9 (wore same clothes for a week).) Even underwear is cleaned infrequently. (Vasquez Decl. ¶ 14.) When clothes are laundered, they return dirty or malodorous. (Bell ¶ 15; Mamedova Decl. ¶ 8(d); Vasquez Decl. ¶ 14.) Towels and bedding are also changed infrequently. (Bell Decl. ¶ 16 (no clean towel for two weeks); Balfour Decl. ¶ 11 (sheets and towel have never been washed); Garcia Decl. ¶ 15 (same); Pierre Decl. ¶ 9 (same sheets for three weeks).)

Respondents also say that all detainees have been given bar soap. (LaBier Morrow Decl. ¶ 30.) The detainees do not dispute that they have been given soap, although they received it only recently and in inadequate supply. (Alicandro-Marquez Decl. ¶ 9; Alvarenga Vasquez Decl. ¶¶ 12–13; Garcia Decl. ¶ 18; Mamedova Decl. ¶ 8(e) Pierre Decl. ¶ 9.)

Detainees have been given surgical masks. (LaBier Morrow Decl. ¶ 30.) Some Additional Petitioners report that the masks they were given were of poor quality and would frequently break. (Ramirez Portillo Decl. ¶ 7; Vasquez Decl. ¶ 14.) Others have been given cloth masks, but they are not frequently cleaned. (Alicandro-Marquez Decl. ¶ 9; Balfour Decl. ¶ 11; Faghi Haji Decl. ¶ 10; Vasquez Decl. ¶ 14.) In any event, not everyone wears masks, (Santiago Silva Decl.

¶ 6), and there is no evidence that wearing them is obligatory. None of the three witnesses who testified during the preliminary injunction hearing were wearing masks.

Morrow staff are assigned to particular areas of the facility to prevent cross-contamination. (LaBier Morrow Decl. ¶ 32.) The staff assigned to the dormitories are purportedly given face shields, gowns, N-95 masks, gloves, and hand sanitizer. (*Id.*) However, it is not clear how frequently Morrow staff are wearing this precautionary clothing. During the preliminary injunction hearing, a Morrow staff member appeared onscreen wearing a mask but no face shield or gown. The staff member also had his fingers inside his mask as he entered onscreen, and he appeared to be either putting on his mask or adjusting it.

Petitioners' expert on health-related risks associated with incarceration, Dr. Novisky, has opined that Morrow is not providing adequate medical care and is not equipped to take basic public health precautions or to contain the spread of the virus. (Novisky Decl. ¶ 7.) The number of infections at Morrow has the potential to escalate further and to create a community hotspot. (*Id.* ¶ 10.) She surmises that "there is no realistic set of internal conditions or practices that [Morrow] can adopt . . . that will mitigate additional infection of prisoners and staff" and that "detainees and staff are now being exposed, and re-exposed, constantly . . . ." (*Id.* ¶ 17.)

Dr. Walson also does not think that Morrow has the ability to appropriately care for its detainees who are infected with COVID-19. Based his review of Mr. LaBier's declaration, Morrow does not have "adequate availability of trained personnel to conduct appropriate monitoring, assess deterioration, and, if necessary, escalate care until transfer is possible . . . ." (Walson Decl. 2 ¶ 11.) Specifically, a facility without onsite medical staff twenty-four hours per day cannot adequately evaluate and assess those infected with COVID-19. (*Id.*) Dr. Walson also

considers it problematic that Morrow staff do not appear to be responsive to detainees' reports regarding their health. (*Id.* ¶ 13.)

Dr. Walson also opines that Morrow's infection history indicates that the jail has been unable to control transmission of the virus, which means that the likelihood of continued transmission to detainees, staff, and visitors "remains exceptionally high." (*Id.* ¶¶ 16, 18.) Dr. Walson contends that the precautions that Morrow has taken are not adequate to prevent the further spread of infection. (*Id.* ¶¶ 19–20.) The only effective way to protect the health of the individuals inside the walls of Morrow as well as the surrounding community is to depopulate the facility. (*Id.* ¶¶ 19–21.)

## II.    PROCEDURAL BACKGROUND

On April 24, 2020, the Original Petitioners filed a Petition for Writ of Habeas Corpus and Complaint for Injunctive and Declaratory Relief, as well as a Motion for Temporary Restraining Order ("TRO"). (ECF Nos. 1, 2.) The Original Petitioners argued that they should be temporarily released from ICE custody because they suffer underlying conditions that render them unusually susceptible to dangerous consequences were they to contract COVID-19 and because the jails at which they were detained had reported positive COVID-19 infections. (*Id.*) On April 27, 2020, the Court held a preliminary conference on the motion and, on a limited record, granted the TRO and ordered the temporary release of the Original Petitioners. (ECF No. 8.)

On May 5, 2020, Petitioners filed an Amended Petition for Writ of Habeas Corpus and an Amended Complaint in which they added the Additional Petitioners. (ECF No. 14.) Simultaneously, Petitioners filed a Motion for TRO seeking the release of the Additional Petitioners. (ECF No. 15.) The motion argued that the Additional Petitioners had all contracted COVID-19, or were presumed to be infected, and that they could not convalesce or avoid

potential complications while detained at Morrow. (*Id.*) On May 6, 2020, the Court held a preliminary conference on the motion and, on a limited record, denied the TRO. (ECF No. 31.)

On May 11, 2020, the Court held a preliminary injunction hearing (the "Hearing") to decide whether any of the Original Petitioners should remain released for the duration of these proceedings and to decide whether any of the Additional Petitioners should be released for the same. At the Hearing, the parties submitted numerous declarations and other exhibits, and Petitioners offered testimony via video of three witnesses, Additional Petitioner Mohamed Abdi, Additional Petitioner Juan Antonio Contreras Moran, and Dwayne Roman, another Morrow detainee who is not a party to this case.

## III.     STANDARD OF REVIEW

The Court must consider four factors in determining whether to issue a preliminary injunction: (1) whether the Petitioners have a strong likelihood of success on the merits; (2) whether they would otherwise suffer irreparable harm; (3) whether the preliminary injunction would substantially harm third parties; and (4) whether the preliminary injunction would serve the public interest. *York Risk Servs. Grp., Inc. v. Couture*, 787 F. App'x 301, 304 (6th Cir. 2019). These four factors are not prerequisites, but rather they are to be balanced. *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985). Dispositive weight should not necessarily be given to one factor over the others. *York*, 787 F. App'x at 304–05. However, the likelihood-of-success factor is the most important of the factors. *O'Toole v. O'Connor*, 802 F.3d 783, 792 (6th Cir. 2015). "Preliminary injunctions in constitutional cases often turn on likelihood of success on the merits, usually making it unnecessary to dwell on the remaining three factors." *Roberts v. Neace*, No. 20-5465, 2020 WL 2316679, at *5 (6th Cir. May 9, 2020).

29

IV.    **ANALYSIS**

A.    **Likelihood of Success on the Merits**

Petitioners have brought a Fifth Amendment claim alleging that their conditions of confinement amount to "punishment" and thus violate their Fifth Amendment rights. Respondents begin with two arguments as to why the Court should not reach the merits: that Petitioners lack standing and that their claims are not properly brought as habeas claims. The Court begins with the question of what standard governs Petitioners' claims.

1.    **Mootness**

This is a habeas action by which Petitioners seek release from ICE detention. Because Majdi Rabee and Alexis Ramirez Portillo have already been released by ICE, the Court considers their claims to be moot. Respondents argue that the Court lacks jurisdiction in these circumstances, but as one of the cases Respondents cite demonstrates, this is not so given that Mr. Rabee and Mr. Ramirez Portillo remain subject to a final removal order and an Order of Supervision. *See Mbaye v. Price*, No. 2:11-CV-1015, 2012 WL 4364256, at *1 (S.D. Ohio Sept. 24, 2012) ("[A] Final Removal Order and interim Order of Supervision . . . suffice to invoke habeas corpus jurisdiction of the federal courts.").

Ordinarily, voluntary action, such as a release from detention, would not moot a claim. *See City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) ("It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."). However, in this unique habeas context, where Petitioners only seek release from custody, the Court finds that, while it retains jurisdiction, Mr. Rabee's and Mr. Ramirez Portillo's claims have been mooted by being given the exact remedy

that they sought. However, should they be re-detained, they may seek further relief from this Court.

## 2.    The Standard Governing the Fifth Amendment Claim

The parties disagree on what standard governs the Fifth Amendment claims that Petitioners have asserted. Petitioners argue that the Fifth Amendment's unconstitutional "punishment" standard applies, while Respondents argue that it is the Eighth Amendment's deliberate indifference standard, imported into the Fifth Amendment via the Due Process Clause, that applies.

The Fifth Amendment's Due Process Clause governs the "conditions or restrictions of pretrial detention." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). It prohibits the punishment of a detainee "'prior to an adjudication of guilt.'" *J.H. v. Williamson Cty.*, 951 F.3d 709, 717 (6th Cir. 2020) (quoting *Bell*, 441 U.S. at 535). This same standard applies in the civil detention context. *See Youngberg v. Romeo*, 457 U.S. 307, 320–21 (1982). A pretrial detainee can demonstrate that he has been unconstitutionally "punished" under the Fifth Amendment by showing intentional punishment or "by showing that a restriction or condition is not rationally related to a legitimate government objective or is excessive in relation to that purpose." *J.H.*, 951 F.3d at 717.

It is the Eighth Amendment, on the other hand, that generally governs the provision of medical care in the jail setting. *See Estelle v. Gamble*, 429 U.S. 97, 102–03 (1976). But since the Eighth Amendment does not apply to pretrial detainees, *Kingsley v. Hendrickson*, 576 U.S. 389, 135 S. Ct. 2466, 2475 (2015), pretrial detainees' rights to adequate medical treatment are governed by the Fifth Amendment's Due Process Clause, *see Watkins v. City of Battle Creek*,

273 F.3d 682, 685–86 (6th Cir. 2001).[9] Regardless, the Fifth Amendment imports the Eighth Amendment standard in the context of the adequacy of pretrial detainees' medical care. *See id.*

Inadequate medical care in a jail facility violates the Eighth Amendment when jail officials have acted with "deliberate indifference" to a detainee's "serious medical needs." *Adkins v. Morgan Cty.*, 798 F. App'x 858, 861–62 (2020). This deliberate indifference standard has both an objective and subjective component.[10] *Id.* at 862. The objective component requires proof of a sufficiently serious medical need where the conditions of detention pose a substantial risk of serious harm. *Id.* The subjective component requires proof of "a state of mind more blameworthy than negligence" and more than an "'ordinary lack of due care for [a] prisoner's interests or safety.'" *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). It does not require proof of a purposeful, or even knowing, act or omission. *Id.* at 836. What the subjective component requires is proof "that the defendant both knew of and disregarded a substantial risk to the plaintiff's health." *Adkins*, 798 F. App'x at 862. Acting with deliberate indifference is "'tantamount to [an] intent to punish.'" *Broyles v. Corr. Med. Servs., Inc.*, 478 F. App'x 971, 975 (6th Cir. 2012) (quoting *Horn v. Madison Cty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994)).

---

[9] *Watkins* discussed the deliberate indifference standard in the context of the Fourteenth Amendment's Due Process Clause. *See* 273 F.3d at 685–86. However, the Fifth Amendment Due Process Clause applies where, as here, it is the actions of the federal government that are at issue. *See Scott v. Clay Cty.*, 205 F.3d 867, 873 n.8 (6th Cir. 2000).

[10] Given intervening changes in the law, it remains an open question whether a pretrial detainee or, it follows, a civil detainee must prove the subjective component. *See Richmond v. Huq*, 885 F.3d 928, 938 n.3 (2018) (noting circuit split but declining to address the issue). However, the Court considers itself bound to apply the standard deliberate indifference framework until receiving further guidance from the Sixth Circuit Court of Appeals or the Supreme Court. *Cf. Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

What the plaintiff must prove is that the defendant was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that he drew that inference. *Farmer*, 511 U.S. at 837. Because of the difficulty in proving an official's state of mind, the subjective component may be proven through circumstantial evidence. *Baynes v. Cleland*, 799 F.3d 600, 618 (6th Cir. 2015). A court may also "'conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Id.* (quoting *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002)).

These two standards, while related, are distinct. The Fifth Amendment standard governs the overall conditions under which a civil detainee is confined, while the Eighth Amendment standard (imported through the Due Process Clause) applies in the context of the adequacy of the treatment that a civil detainee receives or fails to receive.

The Original Petitioners' claim has nothing to do with the quality of medical care that they received, or might receive, in ICE custody. Rather, it exclusively pertains to the risk that they might contract COVID-19 and the consequences that could potentially flow from such an infection. The appropriate question is whether the Original Petitioners would suffer unconstitutional "punishment" in ICE detention, not whether ICE has been deliberately indifferent to their care. *See Thakker v. Doll*, No. 1:20-CV-480, 2020 WL 1671563, at *7–8 & n.15 (M.D. Pa. Mar. 31, 2020).

The Additional Petitioners' claim is more complex. Because the Additional Petitioners are all infected, or presumed to be infected, with COVID-19, they claim that they cannot properly convalesce while detained at Morrow. This is for two reasons. First, they claim that they cannot receive adequate treatment for their illness at Morrow (the "treatment claim"). Second, they claim that the conditions at Morrow are so unhygienic and deplorable that they are unable to

33

recover from the virus[11] (the "recovery claim"). The former is a medical treatment claim and is governed by the deliberate indifference standard. *See Camacho Lopez v. Lowe*, No. 3:20-CV563, 2020 WL 1689874, at *6 n.6 (M.D. Pa. Apr. 7, 2020) ("In sum, this case is about treatment, not prevention."). However, the latter has nothing to do with the adequacy of the medical treatment that Morrow currently provides or might provide in the future. This recovery claim, like the Original Petitioners' claims, involves the general conditions of detention. It is therefore analyzed under the Fifth Amendment standard of whether the Additional Petitioners have been subjected to unconstitutional "punishment."

### 3. Propriety of the Habeas Vehicle

Respondents argue that Petitioners' claims should be dismissed because habeas is not the proper vehicle to challenge a detainee's conditions of confinement. (Opp. to Pet. for Writ of Habeas Corpus, at 16–17, ECF No. 28; Opp. to Amended Pet. for Writ of Habeas Corpus, ECF No. 36, at 11–13.) While this argument is legally correct under the law of this circuit,[12] it incorrectly assumes that Petitioners are seeking recourse or remedy for their conditions of confinement.

Petitioners have not argued that Butler and Morrow need to change the conditions of their confinement or that Petitioners should be compensated for the conditions that they have had to

---

[11] The Additional Petitioners also argue that they will continue to be re-exposed to, and thus could be re-infected with, the virus. They base this argument on the lack of scientific evidence to refute or support the idea that re-infection is possible. *See, e.g.*, Scientific Brief, World Health Org., "Immunity passports" in the context of COVID-19 (Apr. 24, 2020), *available at* https://www.who.int/news-room/commentaries/detail/immunity-passports-in-the-context-of-covid-19 (noting that there is no evidence that those who have recovered from COVID-19 are protected from reinfection, even if they have developed antibodies). The Court does not consider this aspect of the Additional Petitioners' claim because this lack of evidence stands in the way of the Additional Petitioners' ability to meet their burden to prove a likelihood of success on the merits. That is, if there is no evidence that re-infection can occur, there is also no evidence that the Additional Petitioners can use to prove that a risk of re-infection is constitutionally unacceptable.

[12] *See Velasco v. Lamanna*, 16 F. App'x 311, 314 (6th Cir. 2001).

endure. Rather they have argued that they cannot constitutionally be detained at Butler or

Morrow *at all* under the circumstances of the current pandemic. (*See, e.g.*, Amended Petition

¶ 135, ECF No. 14 ("Plaintiffs' detention is not 'reasonably related' to its objective because it

creates a serious risk of imminent illness and death."); Walson Decl. 2 ¶ 11.)[13] This remains true

for Additional Petitioners' treatment claim. Although the Additional Petitioners *object* to their

conditions of confinement, they are not seeking to *remedy* those conditions.[14] Rather, they argue

that Morrow's conditions of confinement are inherently inadequate and irremediable under the

current circumstances and that release from confinement is the only way to remedy these alleged

wrongs. (*See* Walson Decl. ¶¶ 11–12, 16–18.) A lawsuit raising the question of the validity of a

prisoner's confinement is the archetypal habeas case. *See Preiser v. Rodriguez*, 411 U.S. 475,

490 (1973) ("In short, Congress has determined that habeas corpus is the appropriate remedy for

state prisoners attacking the validity of the fact or length of their confinement . . . .").

Petitioners thus may bring their claims under § 2241 because they seek "immediate

release from confinement as a result of there being no conditions of confinement sufficient to

prevent irreparable constitutional injury under the" current facts. *Malam v. Adducci*, 2020 WL

1672662, at *3 (E.D. Mich. Apr. 5, 2020), *as amended* (Apr. 6, 2020); *accord Vazquez Barrera

v. Wolf*, No. 4:20-CV-1241, 2020 WL 1904497, at *3–4 (S.D. Tex. Apr. 17, 2020); *Bent v. Barr*,

No. 19-CV-06123-DMR, 2020 WL 1812850, at *2–3 (N.D. Cal. Apr. 9, 2020); *cf. Adams v.

Bradshaw*, 644 F.3d 481, 483 (6th Cir. 2011) (holding that prisoner could bring habeas claim

---

[13] Respondents acknowledge that this is Petitioners' desired remedy. (ECF No. 36, at 11 (noting that Petitioners seek "release from detention"); PI Hr'g Tr. 12:3–4.)

[14] At the Hearing, the Additional Petitioners raised as a secondary argument that they would request an injunction remedying Morrow's conditions. However, the Court construes this argument only as a fail-safe. Additional Petitioners' primary habeas-based argument is that there are no circumstances in which they can constitutionally be detained.

challenging lethal injection protocol where the claim, if successful, could render his sentence
invalid).

### 4.      Standing

Before proceeding to the merits, the Court has an obligation to ensure that Petitioners
have standing. *In re Troutman Enters., Inc.*, 286 F.3d 359, 364 (6th Cir. 2002). To have standing,
a "plaintiff must have suffered an 'injury in fact,'" meaning "an invasion of a legally protected
interest which is (a) concrete and particularized and (b) 'actual or imminent, not conjectural or
hypothetical.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations
omitted) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). The plaintiff must also
prove the existence of "a causal connection between the injury and the conduct complained of
. . . ." *Id.* That is, the injury must be "'fairly traceable to the challenged action of the defendant,
and not the result of the independent action of some third party not before the court.'" *Id.*
(quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). Finally, the plaintiff
must prove that it is likely "that the injury will be 'redressed by a favorable decision.'" *Id.* at 561
(quoting *Simon*, 426 U.S. at 38).

### a.      The Original Petitioners

Respondents argue that the Original Petitioners lack both a factual and legal injury. (ECF
No. 28, at 14–15.) With regard to the Original Petitioners' factual injury, Respondents question
whether the Original Petitioners are actually in a high-risk group. (*Id.* at 15.) However, all
individuals in detention are at heightened risk of infection. The level of risk that is
constitutionally acceptable will change depending on whether an individual is in a high-risk
group. But that is a merits question, not a standing one. Respondents' excessive focus on the

Original Petitioners' factual injury ignores the high degree of risk facing any individual in detention and conflates the standing inquiry with an evaluation of the merits.

As to the Original Petitioners' legal injury, Respondents contend that even if the Original Petitioners are in a high-risk group, the argument that their detention inherently poses an increased risk is purely speculative. (*Id.* at 15.) Yet Respondents concede that Morrow is no longer a safe place to detain uninfected detainees. (*Id.* at 15 n.37.) Instead Respondents contend that Butler is adequately prepared to combat the spread of infection.

Even assuming that Butler has taken strict measures to combat infection, a high risk of future harm is still a cognizable harm. Prison conditions that pose an "unreasonable risk of serious damage to [a prisoner's] future health" are a cognizable harm. *Helling v. McKinney*, 509 U.S. 25, 35 (1993). Assuming the risk is great enough both in terms of likelihood and severity, it is the *risk* that is itself the harm. *See id.*; *Fofana v. Albence*, No. 20-10869, 2020 WL 1873307, at *8 (E.D. Mich. Apr. 15, 2020) ("The Constitution does not require that Petitioners be seriously ill from COVID-19, or that they await the introduction and spread of COVID-19 in their detention facility before they may assert their Fifth Amendment rights."). Other courts have found the same even in jails that, unlike Butler, have not seen a positive case of the virus. *See Bent*, 2020 WL 1812850, at *3 (citing cases).

The Court does not doubt that Butler has taken strict measures to try to protect those inside its walls. However, "[i]t is undisputed that COVID-19 finds its way into almost every workplace and communal setting, and [Respondents] provide little explanation why immigration detention facilities will be different." *Fraihat v. ICE*, No. EDCV 19-1546 JGB (SHKx), 2020 WL 1932570, at *23 (C.D. Cal. Apr. 20, 2020). In particular, the inherent congregate nature of the jail environment, combined with the unusually infectious nature of COVID-19, creates a high

risk of infection of anyone inside the jail. *See Coreas v. Bounds*, No. CVTDC-20-0780, 2020 WL 1663133, at *5 (D. Md. Apr. 3, 2020).

While the virus's infectious spread may be mitigated by the prophylactic measures that Butler has taken, Respondents' evidence does not engender confidence that Butler remains safe for high-risk detainees. The Court has two primary concerns regarding the conditions at Butler. First, as Respondents concede, Butler has not engaged in widespread testing. (PI Hr'g Tr. 120:24–121:15.) That means that the level of circulation of the virus inside its walls is unknown. That level of uncertainty poses an unreasonable risk to the Original Petitioners because without a full grasp on who at Butler has the virus, it cannot possibly be contained.

Second, Butler cannot be hermetically sealed off from the outside world. Individuals continue to be introduced into the jail from the outside world, both due to the introduction of new detainees and the constant cycling of Butler staff into and out of the facility. The latter, of course, is a necessity of the jail's operations. But it does not change the fact that Butler staff go out into the Butler County community and back into the jail on a daily basis, each time with a risk of introducing the virus into the jail. (Novisky Decl. ¶ 15.) Butler County currently has 542 cases. https://coronavirus.ohio.gov/wps/portal/gov/covid-19/dashboards (May 14, 2020, 2:00 PM). And while, relatively speaking, that may seem like a small number, it is higher per capita than fifty-three of Ohio's eighty-eight counties. *See* Mapping Ohio's 22,131 coronavirus cases, updates and trends, https://www.cleveland.com/coronavirus/2020/05/mapping-ohios-22131-coronavirus-cases-updates-and-trends.html (last visited May 14, 2020).

As for the introduction of new detainees, Respondents state that Butler is no longer accepting new inmates or detainees. (PI Hr'g Tr. 124:15–22.) But they also contend that should the Court order that the Original Petitioners be re-detained, they will be sent to Butler, an

38

apparent exception to Butler's policy barring new intakes. If Butler is willing to accept a new detainee every time ICE asks, that necessitates the question of how many other exceptions Butler might make to this policy and thus the utility of having such a policy at all.

Perhaps most concerning is that while Butler has enacted screening protocols for new intakes, there is no evidence of the adequacy of these protocols. Morrow is an unfortunate example. Morrow had implemented a similar protocol prior to its first positive case on April 23, 2020. (LaBier Morrow Decl. ¶¶ 19, 21.) However, this screening protocol did not prevent this first positive case, and it did not prevent the dozens more that followed.

This does not mean that the jailhouse doors of Butler and other correctional facilities across the nation are to be flung wide open. Importantly, these circumstances only establish that the Original Petitioners have standing to bring their claims. Moreover, what distinguishes the Original Petitioners from other detainees is twofold—what appears to be their unique susceptibility to severe infection and the relatively low interest that Respondents have in keeping them detained, both of which will be explained in greater detail below. These qualities are unique to the Original Petitioners' circumstances and are not a basis for depopulating Butler *en masse*.

Respondents also argue that the Original Petitioners' asserted injury is not redressable by release. This is not so. In detention, the Original Petitioners were forcibly detained in an environment in which they could not control several things that the public health authorities have told us are crucial to keeping the virus at bay. Most importantly, they did not have the liberty to control the number and frequency of their interactions with other people; that is, their ability to practice social distancing was limited. In the outside world, however, the Original Petitioners could live in quarantine should they choose to do so, and, in fact, the Court ordered such a

quarantine for the first fourteen days of their release. The Original Petitioners also have the

ability to control other things about their level of hygiene that they could not control while

detained, such as the frequency with which their environment is cleaned, the cleaning products

used, and how often they change or wash their clothes. To say that it is just as likely that the

Original Petitioners would be exposed to COVID-19 through community transmission ignores

these mitigating steps that they can take in the outside world that they cannot take in detention.

*See Coreas*, 2020 WL 1663133, at *6. It also ignores the multitude of expert findings "that there

are particular risks associated with outbreaks within detention facilities." *Bent*, 2020 WL

1812850, at *4.

Moreover, the standard for a Fifth Amendment claim examines the risks created by the

government, here the risks created by Respondents' detention of Petitioners. *See Jones v. Wolf*,

No. 20-CV-361, 2020 WL 1643857, at *9 n.8 (W.D.N.Y. Apr. 2, 2020) ("The violation

*necessarily* ends when the individual no longer is in state custody.") Those risks would be

entirely redressed by release, regardless of what risks exist in the outside world. The Original

Petitioners have standing to bring their claims.

### b.    The Additional Petitioners

Respondents similarly argue that the Additional Petitioners lack standing because they

claim that Additional Petitioners' risk of suffering severe and debilitating symptoms is equally

speculative. (ECF No. 36, at 10.) This is belied by the evidence. At least thirteen Additional

Petitioners have already experienced difficulty breathing. (Abdi Decl. ¶ 9; Balfour Decl. ¶ 8; Bell

Decl. ¶ 10; Contreras Moran Decl. ¶ 7; Faghi Haji Decl. ¶ 8; Garcia Decl. ¶ 10; Navarro

Gonzalez Decl. ¶ 12; Pierre Decl. ¶ 8; Salas-Marin Decl. ¶ 7; ECF No. 39-2.) This is an

"emergency warning sign" that, according to the Centers for Disease Control ("CDC"), warrants

immediate medical attention. https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/steps-when-sick.html#warning-signs (last visited May 13, 2020). Moreover, Dr. Walson opines, without refutation, that *all* individuals infected with COVID-19 are at risk of experiencing a sudden and rapid decline in their condition. This potentiality, combined with Morrow's lack of adequate monitoring, creates a genuine risk that is sufficiently "imminent," and in some cases already present, to give the Additional Petitioners standing. *See Helling*, 509 U.S. at 33 ("We have great difficulty agreeing that prison authorities . . . may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year.").

Respondents also argue that the Additional Petitioners' desired relief cannot be redressed by their release from detention because they "are already receiving the exact medical care recommended by" ODH. (ECF No. 36, at 11.) Respondents' crabbed conception of "medical care" ignores the need to monitor the symptoms of an individual infected with COVID-19. Even assuming the Additional Petitioners would not receive any additional medicinal treatment upon their release from detention, the undisputed evidence in the record establishes both that Morrow is inadequately monitoring the Additional Petitioners' symptoms and that the Additional Petitioners would have the increased autonomy to self-monitor upon release.

Two examples are illustrative. First, while detained at Morrow, the Additional Petitioners have their temperature taken no more than twice per day by a correctional officer using an expired thermometer that generates dubious results. If released, the Additional Petitioners would be free to purchase a functional thermometer, to use that thermometer as many times per day as they wished, and they could even consult a medical professional to check and monitor their body temperature or any other symptoms.

Second, while detained at Morrow, should the Additional Petitioners' symptoms worsen, in the best case scenario they are at the mercy of a nurse to determine whether consultation with a doctor or a trip to the hospital is necessary. Or, as has happened at Morrow, they must convince a correctional officer that care is necessary, who must then decide whether to consult a nurse, who must then decide whether to escalate care. Both scenarios have the potential to involve unreasonable delay that does not exist in the outside world. If released, the Additional Petitioners would have the autonomy to consult a medical professional of their choosing at a time of their choosing. To say that the Additional Petitioners are receiving adequate medical attention is a pollyannaish perspective based on Mr. LaBier's cherrypicked statements that are unsupported by the record.

### 5.    The Merits of the Fifth Amendment Claim

#### a.    The Original Petitioners

Turning to the merits, because they have been released pursuant to this Court's order on the TRO, the relevant question as to the Original Petitioners is whether their release should be continued because their re-detention at Butler would constitute unconstitutional "punishment" under the Fifth Amendment. The Original Petitioners can make out such a claim by showing intentional punishment or "by showing that a restriction or condition is not rationally related to a legitimate government objective or is excessive in relation to that purpose." *J.H.*, 951 F.3d at 717. Nobody contends that ICE is seeking to intentionally punish the Original (or Additional) Petitioners, so the question is whether the latter—unintentional punishment—exists here.

Respondents undoubtedly have a legitimate interest in detaining immigrants in removal proceedings in order to ensure that they will appear for future court proceedings and that the government will be able to deport them. And in "normal times," this interest may well carry the

day in most cases of detainees seeking release from ICE custody. *See Rafael L.O. v. Tsoukaris*, No. 20-3481, 2020 WL 1808843, at *7 (D.N.J. Apr. 9, 2020). But this is not an interest that will necessarily supersede any catastrophic conditions in a detention center. A court in another jurisdiction has constructed an apt analogy:

> [C]onsider if civil detainees were being housed in a facility in the direct path of a hurricane and that the facility was unlikely to withstand the force of the storm. The government would still have a legitimate governmental interest in ensuring that the detainees appeared for immigration court – but the government would not have a legitimate interest in housing the detainees in that particular facility during the hurricane. COVID-19, and its associated risks, is the difference maker – it changes the equation in evaluating the government's legitimate objectives.

*Id.* Put simply, the question is whether the risks to the Original Petitioners' safety sufficiently outweigh (i.e., whether they are "excessive in relation to") Respondents' interest in detaining the Original Petitioners. *See Malam*, 2020 WL 1672662, at *9–12.

Respondents do not dispute that Mr. Njie had thyroid cancer and that he is immunocompromised. Respondents' own guidance acknowledges that this places Mr. Njie in a high-risk category. (*See* ECF No. 2-5, at 6 (classifying immunocompromised detainees as "higher-risk").) Nor do Respondents dispute that Mr. Prieto Refunjol has hypertension, (Tiruchelvam Decl. 1 ¶ 13), which Respondents concede places him in a high-risk category as well, (PI Hr'g Tr. 122:25–123:13).

The balance of interests is particularly skewed in the case of Mr. Njie and Mr. Prieto Refunjol because they are not apparent flights risks.[15] Both have family in the United States, and Mr. Njie has family in Ohio. Both are also pursuing immigration relief in the hopes of remaining in the country. Respondents have no apparent interest in detaining Mr. Njie or Mr. Prieto

---

[15] Nor does it appear that they pose any danger to the community, although it is not clear how any such risk should factor into the Court's analysis here given that Petitioners are all in civil detention. Regardless, Mr. Prieto Refunjol and Mr. Njie have minimal, nonviolent criminal histories.

Refunjol beyond ensuring their appearance at future proceedings, so without any risk of flight or nonappearance, the interest in detention is slight.

        In contrast to this minimal risk of flight, the risk of infection and potentially catastrophic consequences is great. There is no dispute that Butler has at least two confirmed COVID-19 infections, and we do not know the real infection rate given the paucity of tests. This lack of systematic testing leaves an evidentiary void regarding the scope of the spread of the virus. Nor is there any dispute that infection easily spreads in a jail setting. Even though Butler is isolating symptomatic prisoners, that is inadequate because COVID-19 can be transmitted by asymptomatic individuals. https://www.cdc. gov/coronavirus/2019-ncov/php/public-health-recommendations.html (last visited May 13, 2020). Butler's precautions are thus inadequate to safeguard Mr. Njie and Mr. Prieto Refunjol and to protect them from unconstitutional punishment.

        That is not to say that no detainee can constitutionally be housed at Butler. But Mr. Njie and Mr. Prieto Refunjol are not ordinary detainees. There are many civil detainees who are not at a high risk to be severely impacted by the virus. And while all detainees appear to be at equal risk of infection, not all are at equal risk of severe consequences if infected. But the evidence shows that Mr. Njie and Mr. Prieto Refunjol are in this group of detainees at risk of severe consequences. Each has identified an underlying condition that may result in severe health effects were he to become infected. In short, the risk of infection for these two men is too great to bear under the circumstances. It is likely that forcing either man to risk such severe infection would constitute unconstitutional "punishment" in violation of the Fifth Amendment under these unique circumstances.

Mr. Keita is a more difficult case. He claims that he has asthma, but he has been unable to offer any supporting evidence, such as medical records or supporting witnesses. In addition, even taking Mr. Keita's statements as true, he never contends that he has moderate-to-severe asthma, nor does he mention any facts such as frequent breathing attacks that could allow the Court to conclude that he does. Petitioners' evidence does not support the contention that a less severe asthmatic is at higher risk for complications from COVID-19.[16] Mr. Keita thus has not sustained his burden to prove that he is at a high risk and thus that he is likely to succeed on the merits of his claim.

**b.      The Additional Petitioners**

The Additional Petitioners' claims each require individualized review. However, the conditions at Morrow are common to each Additional Petitioner's claim.

Through inadequate testing, inadequate observation, and inadequate isolation strategies, Morrow allowed its infection numbers to soar exponentially, and now every detainee in the large and small dormitories has been infected. This reckless, out-of-control spread of infection is constitutionally unacceptable. However, as this Court has previously remarked "the horse is [unfortunately] out of the barn" in terms of the spread of the infection. (TRO Prelim. Conf. Hr'g Tr. 43:11–14. (May 6, 2020).) Thus, the question now is whether the Additional Petitioners can receive adequate treatment and can adequately recover while they remain in Morrow's custody.

In examining the conditions of Morrow, the Court gives little weight to Mr. LaBier's assertions. He offers no basis for the information he has provided to the Court or what he did to

---

[16] Dr. Walson's declaration states that individuals with "asthma," generally, are at higher risk, but this claim is not supported by the study that he cites in purported support of this contention. (*Compare* Walson Decl. 2 ¶ 5(a), *with* Wei-jie Guan, et al., Comorbidity and Its Impact on 1,590 Patients with COVID-19 in China: A Nationwide Analysis (Mar. 31, 2020), MedRxiv, https://doi.org/10.1101/2020.02.25.20027664.)

verify it. There is no evidence that he has visited Morrow since the COVID-19 pandemic began. Many of Mr. LaBier's assertions are flatly contradicted by the Additional Petitioners, who are currently living inside of Morrow. Of course, the Additional Petitioners have an incentive to embellish their testimony. But Mr. LaBier and the Morrow staff have a similar incentive to minimize the severity of the jail's conditions. The Court finds most of the Additional Petitioners' consistent reports to be credible and credits them over Mr. LaBier's unfounded characterizations.

As best the Court can tell, Mr. LaBier has attested to the facts that he assumes or hopes to be true. Respondents had the opportunity to support this testimony with evidence from individuals on the front lines of Morrow, from nurses or correctional officers or other staff. They chose not to provide this Court with such information. The Court draws an adverse inference from this lack of firsthand evidence. *See Digital Filing Sys., LLC v. Aditya Int'l*, 323 F. App'x 407, 418 (6th Cir. 2009) ("[Based on the] defendant's failure to come forth with accurate or complete records, a court may draw adverse inferences from this lack of information.").

Of course, the burden was not on Respondents in these proceedings, and the Respondents could have chosen to introduce no evidence at all had Petitioners presented evidence of little heft. But Petitioners have done no such thing. Petitioners have presented substantial, credible evidence that the conditions at Morrow are appalling, and Respondents' feeble evidence offered in response bolsters the likelihood that the Additional Petitioners will succeed on the merits of their claims.

Beginning with the treatment claim, it is likely that the Additional Petitioners can prove that Morrow's failure to monitor detainees' symptoms constitutes deliberate indifference. The Additional Petitioners offer Dr. Walson's uncontradicted testimony that all individuals infected with COVID-19, especially those with comorbidities, must be constantly monitored to assess the

worsening of symptoms and the potential need for the escalation of care. This is particularly so because symptoms can quickly take a turn for the worse and require care within as little as thirty minutes.

Morrow has shown that it is not up to this task. It has no medical staff onsite from 10:00 PM until 6:00 AM every weeknight and no medical staff onsite for fifty-six consecutive hours from Friday at 10:00 PM until Monday at 6:00 AM. While there is always a nurse on call, a nurse who is not onsite cannot provide direct medical monitoring. Instead, detainees must contact the guards who must contact the nurses who must then either travel to the facility or make an assessment without a firsthand examination. The time lag that is inherent in this medical relay race can jeopardize the safety of a detainee whose health rapidly declines during off-hours. While these conditions might be adequate under normal medical circumstances, these are not normal medical circumstances. These conditions do not take into account the unique risks of COVID-19, especially in the context of high-risk detainees.

The evidence also shows that even when they are onsite, the nurses have little if any direct contact with the infected detainees. It is thus difficult to understand how nurses can properly monitor detainees with whom they rarely interact.

The evidence shows that correctional officers monitor detainees' vitals at most two times per day. The infrequency is itself troubling, particularly since Respondents concede that this is below ODH's recommended treatment standard. (*Compare* LaBier Morrow Decl. ¶ 28, *with* PI Hr'g Tr. 111:18–25.) But it is also troubling that the officers are taking detainees' temperatures with expired thermometers. Respondents have provided to the Court forty temperature readings of twenty COVID-19-infected individuals for which the highest recorded temperature is 98.1 degrees. It is not credible that not one of these individuals had an elevated temperature when a

fever is a hallmark of the disease with which they are infected[17], not to mention that several of Additional Petitioners have reported feeling feverish during the time frame in which these temperatures were taken. (Contreras Moran Decl. ¶ 13 (May 9); Perez Decl. ¶ 4 (May 10); Ramirez Portillo Decl. ¶ 9 (same).)

Nor is it clear how the correctional officers are trained, what they are told in terms of interpreting the temperature readings that they collect, or what they are told to do with these readings after collecting them. Respondents assured the Court at the Hearing that a fever (which, based on the information presented, may have never been recorded) would prompt consultation with a nurse. (PI Hr'g Tr. 115:9–115:17.) But there is no evidence in the record to support this assurance. Without clear guidelines, it certainly is possible that detainees with serious symptoms may never be seen by a medical professional. For example, there is no evidence that any of the Additional Petitioners with apparently dangerously low temperatures were medically evaluated.

In addition to the paucity of evidence of nursing care, there is even less evidence that any Morrow detainees have been attended to by a physician. (*See, e.g.*, PI Hr'g Tr. 34:12–21, 58:16–22.) In theory, the jail has the ability to arrange consultations with a doctor using the telehealth system. However, Respondents have been unable to point to a single case when this has occurred, and there is record evidence to indicate that the prospect of seeing a doctor is illusory. For example, Abdiaziz Mohamud was denied an inhaler because he did not arrive at Morrow with a medical document saying he has asthma; when he asked to see a doctor to get a prescription, he was told he could not. (Mohamud Decl. ¶¶ 13–14.)

---

[17] Morrow effectively concedes this point given that it is conducting temperature screenings on all who enter the facility. (LaBier Morrow Decl. ¶ 17.) This would be worthless were a fever not such a significant indicator of infection. Having said this, the Court also questions the quality of these screenings if the same expired thermometers are being used.

Mr. LaBier also claims that "qualified medical staff" ask detainees about their symptoms. (LaBier Morrow Decl. ¶ 28.) This is not supported by the record. Respondents all but conceded that it is the correctional officers who conduct the vitals checks, (PI Hr'g Tr. 109:22–110:5, 114:16–115:1), while indicating that the individuals doing the vitals checks simultaneously ask about symptoms, (*see* LaBier Morrow Decl. ¶ 28; ECF No. 39-2). It is thus evident that, at least for the most part, it is not "qualified medical staff" performing these checks.

There is an additional problem with these symptom checks in that there is an apparent language barrier. Several of Additional Petitioners do not speak English, and Respondents have made no apparent attempt to try to understand the symptoms of detainees who cannot effectively verbalize how they are feeling in their non-native tongue. It is unacceptable that, in gathering information that might indicate an individual's health is in jeopardy, correctional officers may not even understand what a detainee is saying.

Multiple detainees also point to the care, or lack thereof, received by a detainee who is not a party to these proceedings, Bernardo Diaz Rodriguez. As his condition worsened, Mr. Diaz Rodriguez begged for a doctor for days, as did other detainees on his behalf. (Abdi Decl. ¶¶ 11–13; Faghi Haji Decl. ¶ 13; Mohamud Decl. ¶¶ 16–17; Rivera Rodriguez Decl. ¶ 10; Vergara Patino Decl. ¶¶ 17–19; PI Hr'g Tr. 37:18–38:15.) As he struggled to breathe, the response by the staff at Morrow was to send a corrections officer in to take his temperature and to bring him a blanket. (Abdi Decl. ¶ 12; Mohamud Decl. ¶ 17.) Mr. Diaz Rodriguez's condition continued to worsen until he was finally seen by a nurse and taken away. (Abdi Decl. ¶ 13; Mohamud Decl. ¶¶ 18–19; Rivera Rodriguez Decl. ¶ 10; Vergara Patino Decl. ¶ 21; PI Hr'g Tr. 39:18–25.) He has not returned, and it may be the case that Mr. Diaz Rodriguez was taken to a hospital. (Abdi Decl. ¶¶ 11–13; PI Hr'g Tr. 39:11–14, 45:12–17.) Respondents have offered no information to

contradict this account of the Morrow staff's disregard for Mr. Diaz Rodriguez's health. (PI Hr'g Tr. 48:4–10.)

Although Mr. Diaz Rodriguez is not a party to these proceedings, Petitioners' evidence demonstrates that he was treated with paradigmatic deliberate indifference, and Respondents have offered no evidence to rebut this. Mr. Diaz Rodriguez is the unfortunate canary in the coal mine. This apparently emergency situation was an opportunity for Morrow staff to demonstrate that it was up to the task of caring for a COVID-19 patient who was in rapid decline. The unacceptable delay in elevating Mr. Diaz Rodriguez's care demonstrates that Morrow's staff failed this test.

Respondents argue that the Additional Petitioners are getting the only treatment recommended by ODH, Tylenol. (ECF No. 36, at 5–6.) This entirely misses the point. It ignores that medical "treatment" extends beyond curing or alleviating a patient's ills. It also requires symptomatic monitoring. It is difficult to see how any medical professional could treat a diagnosed condition, much less one as serious as COVID-19, without monitoring the patient's progress. This monitoring component is fundamentally lacking at Morrow.

The question is whether Morrow's insufficient monitoring rises to the level of deliberate indifference. It is likely that it does. The objective component of the inquiry is beyond debate. Nobody can dispute that COVID-19 is a sufficiently serious medical need, and Additional Petitioners have presented persuasive evidence that the conditions of detention pose a substantial risk of serious harm for those infected with the virus. As for the subjective component, the evidence shows that Respondents are aware of the risk to the Additional Petitioners' health and that Respondents have ignored that risk.

Respondents' own actions demonstrates their awareness of this risk. That is, Morrow is aware that it needs to be monitoring detainees. That is why it is taking the limited actions that it is taking (e.g., the vitals checks) and why Mr. LaBier highlights Morrow's purported monitoring in his declaration. But Respondents' infrequent, ineffective, and inaccurate monitoring demonstrates a conscious disregard for this known risk. Most flagrant are Morrow's assertions that it checks detainees' vitals three times per day and that "qualified medical staff" ask detainees about symptoms. These have been proven by the record to be untrue, and Respondents concede that at least the former falls below ODH's recommended standard of care. Medical treatment that falls below the standard of care is not alone sufficient to prove deliberate indifference. But here, Respondents are aware of the standard of care, even citing it to this Court as evidence that they are doing enough. And the evidence shows that Respondents' care falls well below it. That indicates that Respondents have acted with deliberate indifference by being aware of the standard of care but continuing to flout it.

Respondents insist that Additional Petitioners' claim "boils down to allegations only that Respondents are not doing *enough*, which does not state a cognizable claim of deliberate indifference." (ECF No. 36, at 19 (internal quotation marks omitted).) This oversimplification distorts the deliberate indifference standard. In the abstract, a claim that medical treatment does not go far enough might not constitute deliberate indifference. For example, "disagreement over the wisdom or correctness of a medical judgment" cannot sustain a deliberate indifference claim. *See Rhinehart v. Scutt*, 509 F. App'x 510, 513 (6th Cir. 2013). So a jailhouse doctor who mistakenly misdiagnoses an inmate and provides inadequate care has "not done enough" but likely has not acted with deliberate indifference. But that does not mean that every time a medical professional has not "done enough," he or she can hide behind the deliberate

indifference standard. A jailhouse doctor who stands idly by and lets a dying inmate bleed out has not "done enough" but has certainly acted with deliberate indifference.

Respondents have acted more like the idle doctor than the mistaken one. They have not done enough in the sense that they have stood idly by while Morrow staff fecklessly monitor the condition of the Additional Petitioners. They have not acted based on medical judgment. In fact, those who have acted are mostly correctional officers, who are incapable of acting with any medical judgment at all. Putting Additional Petitioners' health and safety almost exclusively in the hands of nonmedical professionals is reckless and irresponsible under the circumstances of the current pandemic and Morrow's large number of infected detainees. This demonstrates that Respondents have acted with deliberate indifference. Given all of this, there is a likelihood of success on Additional Petitioners' treatment claim.

Turning to the recovery claim, there is significant evidence that Morrow is unsanitary and that the staff do not provide detainees with adequate supplies to perform basic hygiene. And it is likely that, under the current circumstances, these filthy and unhygienic conditions are excessive in relation to any legitimate governmental purpose and thus constitute "punishment" under the Fifth Amendment's Due Process Clause.

Detainees are responsible for cleaning their living quarters, including the bathroom, but there are no apparent guidelines for doing so or any supervision by Morrow staff. They are given minimal cleaning supplies and no disinfectant; for those who are too ill to clean, their living spaces remain uncleaned. Soap is in short supply. There are broken toilets and showers. One dormitory has a single functional waterhead with insufficient waterflow for a proper shower. There are also multiple reports that clothing, towels, and sheets, are not washed more than once per week (sometimes less) and that even those clothes that are laundered return soiled.

In the context of the current pandemic, the Court can divine no legitimate purpose behind any of these conditions, save for forcing detainees to clean their own living space. But even this requirement serves no governmental purpose without adequate monitoring by Morrow staff and adequate cleaning supplies. In this context, where there is a highly infectious disease circulating throughout the jail, the community, the nation, and the world, these poor-quality conditions serve no legitimate purpose and have the effect of punishing the detainees, because it affords the detainees' little ability to protect their own health.

Petitioners' unrebutted evidence demonstrates that an unhygienic environment inhibits an individual's ability to recover from COVID-19. This too serves to exacerbate the penological effect of Morrow's conditions under these unique circumstances. There is thus a likelihood of success on Additional Petitioners' recovery claim.

While some Additional Petitioners report that they are feeling better, almost all continue to report symptoms, and none has been determined to be fully recovered. For example, there is no evidence of a single negative test. In addition, the Court has no information about the timing of the onset of infection, so it is impossible to say who is still infected and whether symptoms may occur. Some of Additional Petitioners also report feeling better at times and subsequently worsening, or in some ways feeling better but in some ways feeling worse. Thus, the Court remains convinced that adequate monitoring and an adequate environment for recovery are necessary for those who are infected and most at risk of potential complications.

The uniqueness of this case cannot be overemphasized, and the Court's constitutional analysis relies on the intersection of the severity of the COVID-19 pandemic, the number of infections at Morrow, and the conditions at Morrow. Petitioners acknowledge that we would not be here but for the pandemic and the widespread rate of infection at Morrow. (PI Hr'g Tr. 98:2–

18.) Because of these two conditions, Morrow's inability to control the spread of infection, its demonstrated failures at monitoring detainees' symptoms, and its poor conditions create an unconstitutionally acceptable environment for those detainees in its custody who are currently most at risk. It is these unique circumstances that create conditions that are tantamount to an intent to punish and allow Petitioners' health interests to prevail over Respondents' detention interests.

### B.    Irreparable Harm

While the extent of irreparable harm may be balanced against other facts, the existence of some sort of irreparable harm is required for a preliminary injunction to issue. *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019). The extent of the harm is to be balanced against the other factors, although some level of irreparable harm must exist. *See id.*

In this context, the irreparable harm inquiry is heavily individualized, and in the Court's view it mostly boils down to the question of which of Petitioners are in the "high risk" category. Those deemed to be at highest risk are not only at greatest risk of serious symptoms, but Dr. Walson attests that their condition is especially likely to change rapidly.

Based on the evidence, the Court considers the following Petitioners to be most at risk of severe health complications and thus irreparable harm: Sidi Njie (immunocompromised due to cancer treatment), Adenis Prieto Refunjol (hypertension), Mohamed Abdi (asthma), Dave Alvarenga Vasquez (diabetes), Antonio Aparicio Luna (hypertension), Ranoldo Balfour (history of breathing issues), Jesus Manuel Chavez Rodriguez (Chronic Hepatitis C), Jose Misael Navarro (immunocompromised due to shingles), Abdiaziz Mohamud (obesity), Alberto Perez Arreaga (sixty-six years old), Neptune Pierre (hypertension), Jorge Salas-Marin (COPD), and Jose Luis Vergara Patino (lung damage). Each of these individuals has provided sufficient

evidence of a condition or circumstance that renders him uniquely susceptible to severe complications from the virus. It is thus these thirteen petitioners who are most at risk of irreparable harm.

Respondents attempt to challenge some of these risk factors, but their attempts with respect to these petitioners are unavailing. Respondents' primary defense is that these petitioners did not mention their medical complications when they were taken into ICE custody. (*See, e.g.*, Hinman Decl. ¶ 10; Nguyen Decl. ¶¶ 10–12; Winters Decl. ¶ 15.) However, Respondents have provided no evidence of who asked any of the petitioners about their medical histories or what questions they were asked or even whether they were asked about their medical history at all. The Court thus gives no weight to these assertions.

As for the remaining petitioners whose claims are still live—Eduardo Alicandro-Marquez, Juan Antonio Contreras Moran, Jermaine Bell, Osman Faghi Haji, Salvador Garcia, Kevin Rivera Rodriguez, and Fabian Santiago Silva—there is insufficient evidence that they are at high risk for severe complications due to their medical history. The Court thus determines that they are at little risk of irreparable harm.

### C.     Risk of Harm to Third Parties and Public Interest

In a constitutional case, as here, "an inquiry into the public interest is difficult to separate from the likelihood of success on the merits because 'the public interest is promoted by the robust enforcement of constitutional rights.'" *Rhinehart*, 509 F. App'x at 516 (quoting *Am. Freedom Def. Initiative v. Suburban Mobility for Reg. Transp.*, 698 F.3d 885, 896 (6th Cir. 2012)). And "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994). It is also in the public interest to ensure that individuals are treated justly and

humanely, including those detained in our jails and prisons. *Cf. Farmer*, 511 U.S. at 832 ("The

Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones

. . . ." (internal citation omitted) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981))).

Respondents make two primary arguments that Petitioners' release is not in the public

interest. First, they argue that they pose a risk to the public due to their criminal histories and that

they pose a flight risk. The Court gives this evidence little weight. Petitioners are currently

civilly detained on immigration charges and are awaiting their deportation from the country.

Most have minimal, nonviolent criminal histories, and all those with convictions have either

served their criminal sentences or have been released from custody on any pending criminal

charges. It is also noteworthy that for seven of Petitioners, ICE has granted them voluntary

departure or has previously released them from custody.

Second, with regard to the Additional Petitioners, Respondents emphasize the risk of

releasing individuals who have tested positive for COVID-19 into the community. The Court

also gives this argument no weight. ICE saw fit to release at least two positive detainees (Majdi

Rabee and Alexis Ramirez Portillo) and offers no explanation for why Mr. Rabee and Mr.

Ramirez Portillo posed no public health threat but the remaining eighteen Additional Petitioners

do. Petitioners have also put forward persuasive evidence that the current large cluster of positive

cases at Morrow creates a larger threat to public health than does releasing some or all of these

detainees from custody. This is because this large cluster of positive cases has the potential to

overwhelm local hospitals should multiple detainees' conditions deteriorate and it increases the

risk of infecting Morrow staff who cycle in and out of the jail and the community each day.

The latter is particularly concerning because of the inadequate precautions that Morrow

has taken to prevent its staff from contracting the virus and from spreading it to the broader

community. As mentioned previously, those entering the jail have their temperature screened, but as far as the Court can tell, their temperatures may well be screened with the same faulty equipment as the detainees.

Although Morrow has begun to use PPE to prevent the further spread of infection to its staff and out into the community, these efforts do not engender confidence. While inmates have been provided with masks, they have been provided with surgical masks that break easily or with cloth masks that are infrequently washed. There is also no evidence that there is any requirement that detainees wear masks, and in fact, none of the three witnesses who testified were wearing (or even holding) masks. Similarly, in the pictures of Morrow provided by Petitioners, no detainees appear to be wearing masks. (*See* ECF No. 38-24.) It is thus questionable how much protection these masks are providing Morrow staff.[18] And while Mr. LaBier represents that staff are wearing face shields and gowns, this is either false or unenforced, for the correctional officer seen on the video during the Hearing was wearing neither. This correctional officer was also sticking his fingers inside of his mask, which nullifies its protective abilities.

The Court finds that it serves the public interest to reduce the number of detainees at Morrow. Gathering fewer people who can be infected and fewer people who are infected in one place helps protect the further spread of the virus. That is the whole point of social distancing. It helps protect the detainees. It helps protect the jailhouse staff. And it helps protect us all.

### D.    Balancing the Factors

Petitioners have a strong likelihood of success on the merits. However, only those petitioners who are most at risk can prove irreparable harm, and at least some measure of

---

[18] The Court assumes that the usage of masks by detainees is designed to prevent them from spreading the virus to others, not for their own personal protection. *See* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/diy-cloth-face-coverings.html (last visited May 13, 2020).

irreparable harm is crucial to the decision of whether a preliminary injunction may issue. On balance, primarily based on a lack of irreparable harm, the Court concludes that the factors do not warrant a preliminary injunction for those petitioners who are not at higher risk due to their age or health.

## V. CONCLUSION

For the reasons described above, the Court **GRANTS** Petitioners' Motion for Preliminary Injunction for Sidi Njie, Adenis Prieto Refunjol, Mohamed Abdi, Dave Alvarenga Vasquez, Antonio Aparicio Luna, Ranoldo Balfour, Jesus Manuel Chavez Rodriguez, Jose Misael Navarro, Abdiaziz Mohamud, Alberto Perez Arreaga, Neptune Pierre, Jorge Salas-Marin, and Jose Luis Vergara Patino and **ORDERS** the following:

Sidi Njie and Adenis Prieto Refunjol are to remain released for the duration of this litigation. They are to continue on home detention. They will not be subject to GPS monitoring.

Mohamed Abdi, Dave Alvarenga Vasquez, Antonio Aparicio Luna, Ranoldo Balfour, Jesus Manuel Chavez Rodriguez, Jose Misael Navarro, Abdiaziz Mohamud, Alberto Perez Arreaga, Neptune Pierre, Jorge Salas-Marin, and Jose Luis Vergara Patino are **ORDERED** to be released as soon as they provide Respondents with the address where they will be residing, how they will be getting to that address, and the names and telephone numbers of all adults in the residence. They are ordered released for the duration of this litigation.

Each is ordered to quarantine himself in compliance with CDC and ODH guidelines until he is symptom-free for fourteen days or until he has tested negative for the virus, whichever occurs first. Each is ordered to file declarations, as soon as possible after release, confirming that he will comply with this quarantine order and that he will comply with CDC and ODH guidelines.

Each is ordered to remain on home detention following the conclusion of his quarantine period. They will not be subject to GPS monitoring.

The Motion for Preliminary Injunction for Mory Keita, Eduardo Alicandro-Marquez, Jermaine Bell, Juan Antonio Contreras Moran, Osman Faghi Haji, Salvador Garcia, Kevin Rivera Rodriguez and Fabian Santiago is **DENIED**.

Should ICE seek to re-detain Mr. Keita prior to final disposition of this case, he shall be permitted to self-surrender and, should he be re-detained, it is **ORDERED** that he be kept in quarantine by himself until further order of this Court. He may not be detained at Morrow for the duration of this litigation.

The Motion for Preliminary Injunction for Majdi Rabee and Alexis Ramirez Portillo is **DENIED WITHOUT PREJUDICE** as moot.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**