IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**ADENIS ENRIQUE PRIETO REFUNJOL,** *et al.*,

    **Plaintiffs,**

v.

**REBECCA ADDUCCI,** *et al.*,

    **Defendants.**

:     Case No. 2:20-cv-2099

:     **Judge Sarah D. Morrison**
       **Magistrate Judge Chelsey M. Vascura**

:

## **OPINION AND ORDER**

Petitioner Mory Keita has filed a Motion to Reconsider this Court's denial of his request for a preliminary injunction (ECF No. 47), which Respondents oppose (ECF No. 49). The motion is **DENIED**.

**I.  BACKGROUND**

This is the fourth in a series of opinions relating to the detention of various Immigration and Customs Enforcement ("ICE") detainees at two Ohio county jails. The Court has previously explained the background against which this case has been brought, (ECF No. 44, at 1–5), and need not repeat it. Mr. Keita was originally detained at Morrow County Jail ("Morrow") and moved for a temporary restraining order ("TRO") requiring his release. (ECF No. 2.) The Court concluded, based on a limited record, that Mr. Keita had asthma and that his asthma was an underlying medical condition that rendered him unusually susceptible to complications were he to be infected with COVID-19. (ECF No. 8.) Accordingly, the Court ordered Mr. Keita's temporary release. (*Id.* at 10–11.)

Mr. Keita subsequently supplemented the record with additional evidence regarding the conditions at Morrow, which the Court considered in determining the propriety of a preliminary injunction. (ECF Nos. 38, 42.) Respondents also provided evidence to support their contention that Mr. Keita should be re-detained. (ECF Nos. 28, 37.) Based on the evidence presented, the Court concluded that Mr. Keita's limited evidence of asthma was insufficient to sustain his burden to prove that he was at high risk of severe infection and thus that he was likely to succeed on the merits of his Fifth Amendment claim. (ECF No. 44, at 45.) The Court thus denied Mr. Keita's request for a preliminary injunction and permitted his re-detention on the conditions that he be permitted to self-surrender and that he be kept in quarantine. (*Id.* at 59.) The Court also enjoined his re-detention at Morrow.

Mr. Keita now introduces additional evidence of his asthma and moves for the Court to reconsider its denial of his preliminary injunction. (ECF Nos. 47, 48.) Respondents oppose this request. (ECF No. 49.)

      A.      **Petitioner's Medical Condition**

Mr. Keita has maintained from the beginning of this litigation that he has asthma. (Mory Keita Decl. ¶ 6, ECF No. 2-4 ("Keita Decl. 1").) However, in support of his request for a TRO and preliminary injunction, he offered no evidence other than his own declaration. In that declaration, Mr. Keita contended only that he has asthma, that he was denied access to an inhaler at Morrow, that he had had trouble breathing while at Morrow, and that he had previously been granted used of an inhaler while detained at Pickaway Jail. (*Id.*)

Mr. Keita now offers a second declaration in which he expounds upon these matters further. He states that he cannot walk up a flight of stairs without struggling to breathe and feeling pain in his chest. (Mory Keita Decl. ¶ 3, ECF No. 48-1 ("Keita Decl. 2").) He says that he

struggles to breathe while working out or exerting himself during daily activities. (*Id.*) He claims that his emotions sometimes trigger his asthma making it difficult for him to breathe. (*Id.* ¶ 4.) He asserts that he wakes up in the middle of the night multiple times per week gasping for air and that when this would happen at Morrow, he "often" would wake up those around him and would have to work hard to focus and try to breathe. (*Id.* ¶ 7.) Mr. Keita also adds that he frequently used an inhaler prior to his detention. (*Id.* ¶ 5.)

Mr. Keita also submits medical records from 2014, which say that he reported a history of asthma with symptoms three to four times per week. (ECF No. 48-3, at 1.) His asthma was reportedly aggravated by environmental allergens and symptoms were relieved with a beta-agonist inhaler. (*Id.*) His asthma was diagnosed as uncontrolled, and he was prescribed an albuterol inhaler and allergy medicine. (*Id.* at 5.) He also submits a recent letter that reiterates the contents of these 2014 medical records but provides no information about his current condition. (ECF No. 48-4, at 2.)

Respondents likewise submit some evidence bearing on the issue of Mr. Keita's medical condition. When Mr. Keita was first taken into custody at Morrow, he underwent a medical screening during which he twice specifically denied having asthma, according to Morrow's records. (ECF No. 49-1, at 8, 11; Luke Affholter Decl. ¶ 9, ECF No. 49-1.) Moreover, while Mr. Keita contends that he used an inhaler while detained at Pickaway, Pickaway's records do not indicate a diagnosis of asthma or the use of an inhaler. (ECF No. 49-1, at 17–19.)

### B. Petitioner's Re-Detention

ICE seeks to re-detain Mr. Keita not only because of its legal right to detain aliens whom ICE is seeking to remove, but also because Mr. Keita is now immediately removable. His travel documents were issued on May 19, 2020, and ICE is currently working to schedule Mr. Keita's

3

removal flight. (Affholter Decl. ¶¶ 10–11.) Respondents contend that it is "standard practice" to detain an individual while arrangements for deportation are made. (*Id.* ¶ 13.)

Respondents seek to detain Mr. Keita at Calhoun County Jail ("Calhoun") in Battle Creek, Michigan. To bolster their case, Respondents offer a declaration from James Jacobs, a United States Department of Homeland Security manager who supervises ICE's detention facilities in Michigan. (James Jacobs Decl. ¶ 1, ECF No. 49-3.) There is no evidence that Mr. Jacobs has visited Calhoun since the beginning of this pandemic or that he has any firsthand knowledge of the conditions of the facility. Respondents have not provided the Court with testimony from any Calhoun employee or any other individual who has personally witnessed the current on-the-ground conditions of the facility despite this Court's earlier criticisms of this approach. (*See* ECF No. 44, at 18.)

Mr. Jacobs attests that as of May 28, Calhoun has 353 detainees, which is approximately fifty-five percent of its capacity, and every unit is below its maximum capacity. (Jacobs Decl. ¶¶ 19, 22.) As of May 29, only one detainee is suspected to have COVID-19, and he has been isolated, although it appears he was previously in general population for an unknown period of time. (*See id.* ¶ 18.) Calhoun has not had any confirmed cases of COVID-19. (*Id.*) But it does not appear that Calhoun has engaged in widespread testing of its detainees.

Calhoun continues to accept new detainees, who are screened upon intake, and those with known symptoms are isolated, while those with potential exposure to COVID-19 are cohorted and monitored. (*Id.* ¶¶ 12–15.) However, in line with this Court's prior order, Mr. Keita would be housed alone in a cell with direct and exclusive access to a sink and toilet. (*Id.* ¶ 4.) Meals would be brought to him, and he would be permitted to shower while no other detainees are present. (*Id.*)

4

As with Morrow, Calhoun is currently the subject of active litigation. Some detainees have been ordered released from Calhoun[1], while others have not.[2] Driving the outcomes in these cases is whether a petitioner falls into a category that puts him/her at high risk for severe complications from COVID-19. That is, those most at risk have been released, while those who are not at greater risk than the average person have remained in detention.[3]

## II. STANDARD OF REVIEW

"The Federal Rules of Civil Procedure do not explicitly address motions for reconsideration of interlocutory orders." *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004). However, "[d]istrict courts have authority both under common law and Rule 54(b) to reconsider interlocutory orders and to reopen any part of a case before entry of final judgment." *Id.*; Fed. R. Civ. P. 54(b) ("[A]ny order or other decision . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."). An intervening change in the law, new evidence, or the "need to correct a clear error or prevent manifest injustice" are typical justifications for reconsideration. *Rodriguez*, 89 F. App'x at 959.[4]

---

[1] *See, e.g.*, *Malam v. Adducci*, No. 20-10829, 2020 WL 2616242, at *8 (E.D. Mich. May 23, 2020); *Zaya v. Adducci*, No. 20-10921, 2020 WL 2487490, at *9 (E.D. Mich. May 14, 2020); *Malam v. Adducci*, No. 20-10829, 2020 WL 1899570, at *8 (E.D. Mich. Apr. 17, 2020).

[2] *See, e.g.*, *Murai v. Adducci*, No. 20-10816, 2020 WL 2526031, at *7 (E.D. Mich. May 18, 2020); *Awshana v. Adducci*, No. 20-10699, 2020 WL 1808906, at *14 (E.D. Mich. Apr. 9, 2020).

[3] *Compare Malam*, 2020 WL 2616242, at *1, 8 (ordering release of detainees with high blood pressure and asthma); *Zaya*, 2020 WL 2487490, at *1, 9 (ordering release of detainee with high blood pressure, diabetes, and asthma); *Malam*, 2020 WL 1899570, at *1, 8 (ordering release of detainee with hypertension and chronic obstructive pulmonary disease), *with Murai,* 2020 WL 2526031, at *3, 6–7 (finding detainee's risk of harm to be too remote based on lack of evidence of a serious medical condition or of jail's indifference to his medical condition); *Awshana*, 2020 WL 1808906, at *7, 14 (denying release for petitioner who did not allege he was in a high-risk category).

[4] ICE argues that Petitioners' motion should be analyzed under Rule 60. (ECF No. 49, at 5–7.) But Rule 60 only applies to motions seeking reconsideration of a final order. *Bratcher v. Clarke*, 725 F. App'x 203, 205 n.1 (4th

### III. ANALYSIS

Mr. Keita's acquisition of new evidence warrants this Court's reconsideration of its prior order. The issue is whether this evidence is sufficiently compelling to allow him to meet his burden of proving the necessity of a preliminary injunction. However, Respondents offer several reasons why the Court should not reach the merits.

Respondents argue that this Court lacks jurisdiction to prevent Mr. Keita's re-detention because he is slated to be removed from the United States and because district courts do not have jurisdiction to review removal orders. The argument goes as follows: because detention prior to removal is "standard practice," interference with Mr. Keita's detention interferes with his removal, which the Court is statutorily prohibited from doing. (ECF No. 49, at 16.) The argument is a dubious one, and Respondents offer no authority to support it.

As is relevant here, the Court only lacks jurisdiction over claims "arising from" the Government's decision to "execute removal orders . . . ." 8 U.S.C. § 1252(g). As Respondents' cited authority states, it is "[a]n alien's petition for a writ of prohibition *that directly challenges his or her final order of removal* on constitutional grounds [that] is subject to the jurisdictional bars in" § 1252. *Elgharib v. Napolitano*, 600 F.3d 597, 607 (6th Cir. 2010) (emphasis added). Respondents seek to stretch § 1252 past its breaking point in arguing that the Court has no jurisdiction to review "standard" conditions of detention that allow ICE to execute its removal order in a "practical" manner. (*See* ECF No. 49, at 16.) Were detention necessary to accomplish

---

Cir. 2018) (per curiam); *accord Payne v. Courier-Journal*, 193 F. App'x 397, 400 (6th Cir. 2006) ("Rule 60(b) applies only to 'final' orders."); *cf. Banister v. Davis*, No. 18-6943, 2020 WL 2814300, at *8 (U.S. June 1, 2020) ("A Rule 60(b) motion—often distant in time and scope and always giving rise to a separate appeal—attacks an already completed judgment ."). Although a preliminary injunction order is immediately appealable by statute, it is not a final order. *Bratcher*, 725 F. App'x at 205 n.1; *see Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("[I]t is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits."); *Planned Parenthood Sw. Ohio Region v. Dewine*, 931 F.3d 530, 540 (6th Cir. 2019) (drawing distinction between a preliminary injunction and a "final order" or a "final decision on the merits").

Mr. Keita's removal, it is possible that the Court would lack jurisdiction to prevent his detention, but Respondents present no evidence that it is. "Standard practice" might be the usual course, but it does not mean it is a necessary one. Assuming all the statutory prerequisites have been met, ICE is free to remove Mr. Keita regardless of whether he is detained. This jurisdictional argument fails.

Respondents also renew two arguments that the Court has previously rejected, that Mr. Keita lacks standing and that habeas is not the appropriate vehicle for his claims. (ECF No. 49, at 17–18.) For the same reasons as previously stated, the Court rejects these arguments. (ECF No. 44, at 34–40.)

That leaves the merits of Mr. Keita's motion. The Court previously found that Mr. Keita's's failure to prove that he was in a high-risk category meant that he was not likely to succeed on the merits of his claim. (ECF No. 44, at 45.) And that was fatal to his request for a preliminary injunction. *See Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020) (per curiam) ("Preliminary injunctions in constitutional cases often turn on likelihood of success on the merits, usually making it unnecessary to dwell on the remaining three factors."). Thus, the question here is whether Mr. Keita's additional evidence makes it likely that he will succeed on the merits. Or, to put it differently, the question is whether Mr. Keita's detention at Calhoun would constitute unconstitutional "punishment" under the Fifth Amendment.

As the Court previously outlined, to succeed on his Fifth Amendment claim Mr. Keita must show that the risk to his safety sufficiently outweighs Respondents' interest in his detention. (ECF No. 44, at 43.) There are four reasons why Mr. Keita's evidence it not sufficient to meet his burden.

First, his evidence continues to consist primarily of his self-serving statements, albeit at different points in time. For example, his 2014 medical records' discussion of asthma appears to be based primarily on self-reported symptoms. As for the letter regarding his more recent medical consultation, this, too, appears to be based on nothing more than Mr. Keita's statements rather than objective diagnostic criteria.

Second, there is no current information about the condition of Mr. Keita's asthma. While his asthma was diagnosed as uncontrolled in 2014, there is no indication that that remains the case. For example, the nurse practitioner who most recently evaluated Mr. Keita, Crystal Burnfield, does not opine that his asthma is uncontrolled. There is also no indication that Mr. Keita currently has moderate or severe asthma. His 2014 medical records are silent on the matter, as is Ms. Burnfield's letter. Ms. Burnfield also does not say that Mr. Keita is at particularly high risk of complications from COVID-19. If that were true, she presumably would have said so. Rather, she only says that "[e]xposure to COVID-19 and other respiratory illness should be minimized," (ECF No. 48-4, at 2), which is seemingly true for all individuals, asthmatic or not.

Third, Mr. Keita's expert asserts that in order to determine that asthma is mild, it must be the case that 1) his frequency of symptoms are less than daily, 2) his nighttime awakenings are less than weekly, 3) his use of a rescue inhaler occurs less than daily, 4) his forced expiratory volume must be above a certain level, and 5) he must have used oral corticosteroids less than twice in the past year. (Homer Venters Decl. ¶ 7, ECF No. 48-2.) However, Mr. Keita offers insufficient information with regard to all five of these benchmarks.

Beginning with factor one, Mr. Keita claims in his most recent declaration that he experiences symptoms on a daily basis. (Keita Decl. 2 ¶ 3.) The Court does not give this much credence. It is inconsistent with his medical records from 2014 when he reported symptoms three

8

to four times per week (and did so under circumstances when he had no incentive to embellish), and he does not indicate that his asthma has worsened over the last six years. In addition, Mr. Keita never described daily symptoms in his first declaration. While this is not dispositive, it weighs against his credibility that he did not earlier mention this important information.[5] The same is true of the second factor. Mr. Keita said nothing about nighttime awakenings in his first declaration. He offers no evidence regarding factors three, four, or five. The Court thus has no credible information that Mr. Keita has moderate to severe asthma. Mr. Keita's expert says that patients who have not had their asthma adequately evaluated in the last six months should be considered high risk. (Venters Decl. ¶ 11.) But the Court does not give this cursory statement much weight given the other evidence in the record.

Fourth, Respondents offer evidence that upon intake into Morrow, Mr. Keita was twice asked whether he had asthma and that both times he denied having asthma. Mr. Keita does not dispute this. Again, while not dispositive, this calls into question Mr. Keita's credibility and the validity of his evidence.

For all of these reasons, in combination, Mr. Keita's evidence remains inadequate to sustain his burden to prove a likelihood of success on the merits.

Finally, Mr. Keita criticizes ICE's plan to detain him at Calhoun. It remains troubling that ICE continues to present this Court with no firsthand information regarding the conditions of the

---

[5] Respondents argue that Mr. Keita's second declaration should be completely disregarded under the sham affidavit rule. (ECF No. 49, at 11 n.1.) This is a mistaken invocation of that rule. It primarily applies when an affidavit "directly contradicts prior sworn testimony . . . ." *France v. Lucas*, 836 F.3d 612, 622 (6th Cir. 2016). Where the affidavit is not directly contradictory, it still "should be stricken if it is 'an attempt to create a sham fact issue.'" *Id.* (quoting *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908–09 (6th Cir. 2006)). Mr. Keita's second declaration does not directly contradict his first; rather, it provides additional information that the first one did not contain. Nor is it apparent that he is trying to create a sham fact issue. It makes sense that the second declaration would be more complete than the first. Mr. Keita had more time to engage with his counsel in preparing this second declaration, and he was also communicating with his counsel in a non-custodial setting. But while this new information is not reason to disregard the declaration, it does cast doubt on Mr. Keita's credibility and diminishes the weight of this evidence.

facilities that it uses for detention. It is also concerning that Calhoun does not appear to be conducting widespread testing, and thus while it has yet to have a confirmed COVID-19 case, that may only be because the disease is secretly lurking behind the jail's walls.

Regardless, Calhoun's intention to quarantine Mr. Keita for the duration of his detention should alleviate whatever risk might exist. Of course, it does not eliminate the risk, since jail staff can serve as carriers of the virus, transporting it from elsewhere in the prison or from the outside world. Regardless, the Constitution does not require individuals to be detained in risk-free environments but rather prohibits "unreasonable risk[s] of serious damage to [their] future health." *Helling v. McKinney*, 509 U.S. 25, 35 (1993). Whatever risk exists under these circumstances, it is not unreasonable. The Court considers Calhoun to be an adequate location for detention under these circumstances.

The Motion is **DENIED**.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**